# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


CASE NO.: 0:13-cv-60136-DMM


Odorstar Technology, LLC, et al.

Plaintiffs

v.


SMM Distributors LLC et al.

Defendants

_____/


## EXPERT REPORT OF DR. LOUIS DeFILIPPI ON BEHALF OF PLAINTIFFS ODORSTAR TECHNOLOGY, LLC, et al.

**Table of Contents**

EXHIBIT LIST ................................................................................................................. iii

I.     EXPERIENCE AND QUALIFICATIONS ........................................................... 1

II     SCOPE OF TASK AND MATERIALS CONSIDERED........................................ 2

III.    LEGAL PRINCIPLES ......................................................................................... 3

IV.    SUMMARY OF OPINIONS ................................................................................ 4

V.     OPINIONS AND THE BASES THEREFORE .................................................... 4

    *A. Claim 1 of the '661 Patent*........................................................................... 4

    *B. Claim , 3, 8, 9, 10, 11, 12 and 13 of the '661 Patent*........................................ 15

**EXHIBIT LIST**

1. Curriculum vitae of Dr. Louis DeFilippi, including patents, publications and select experience

2. United States Patent No. U.S. Patent No. 6,764,661 ("the '661 patent")

3. United States Patent Application Publication, Baselli et al., Pub. No.: US 2013/0136685 A1, Pub Date, May 30, 2013 ("the '685 application" or '685 publication or Baselli Publication)

4. SMM's objections and responses to plaintiffs' first set of interrogatories

5. Fig_01_Marine shocker foil pouch_side_a.jpg

6. Fig_02_Marine shocker foil pouch_side_b.jpg

7. Fig_03_Marine shocker instructions-2.jpg

8. Fig_04_Marine shocker contents removed from foil pouch.JPG

9. Fig_05_Marine shocker cut open partially.JPG

10. Fig_06_Marine shocker cut open.JPG

iv

## I.     EXPERIENCE AND QUALIFICATIONS

1.      I hold a bachelor's degree in Chemistry, a Ph.D. degree in Biological Chemistry, and have studied as a Postdoctoral Scholar. I have worked in the Chemical and Biotechnology Industries since 1978.  I have been an independent consultant since 1997 and have performed duties as an expert witness.  I have performed varied investigations and analyses from a chemistry, biochemistry, microbiology and environmental, standpoint as well as analyzed certain physical and mechanical systems.  I often combine these scientific approaches and analyses with an understanding of OSHA, EPA and USDA regulations, as well as environmental processes, to draw my conclusions.  I specialize in a number of diverse areas, including laboratory research, analysis, measurements and data workup, regulatory compliance, patent infringement, safe operation of chemical, biochemical (enzymatic) and microbiological (fermentative) process, ammonia refrigeration, environmental science, groundwater contamination and bioremediation. I am experienced in worker safety, accident prevention, and training on an industrial scale.  I am a member of the American Chemical Society.  I am a named inventor on 16 issued United States patents and numerous international patents.  I have authored or co-authored over 24 publications and published abstracts, have made a number of unpublished scientific presentations, and authored or co-authored numerous consulting reports and memos.  I have written three book chapters and have been a co-editor of one book.

2.      While in industry I was project leader or group leader or manager on numerous projects, funded by both industry and Federal grants, and received a number of awards for my inventions, many of which have been commercialized or licensed.

3.      A current copy of my curriculum vitae setting forth details of my background and relevant experience is attached as Exhibit 1.  Included in that exhibit is a listing of my patents

1

and publications and a listing of select cases involving investigations, consultations and expert witness experience. I have been retained by Christopher & Weisberg, P.A., Ft. Lauderdale, FL, via TASA (Technical Advisory Service for Attorneys) in connection with the above captioned litigation. I am compensated at the rate of $350 per hour (and $450 per hour for depositions).

4.     In support of my testimony, I may use various demonstrative exhibits, including but not limited to, physical samples of BIOCIDE SYSTEMS™ "Odor Eliminator" products and "Shocker™" products, labels and instructions, and portions of the documents cited herein. In addition, I may use blow-ups or electronic versions of the photos, scans and figures included in this report as well as animations, videos or other demonstrative evidence.

## II     SCOPE OF TASK AND MATERIALS CONSIDERED

5.     It is my understanding that Defendant SMM Distributors LLC et al. has caused to be manufactured, offered to sell, and/or sold, a number of products, including "Marine Shocker™", "Auto Shocker™", "RV Shocker™", and "Room Shocker™". As used herein, the term "Shocker™" refers to these above-mentioned products. For purposes of this study I have assumed that the "Shocker" products are all substantially identical based upon visual observation.

6.     I have been asked to study the specifications (including the detailed description of the invention and claims) of U.S. Patent No. 6,764,661 ("the '661 Patent") (Ex. 2); and have also been supplied with U.S. Patent Application Publication, Baselli et al., Pub. No.: US 2013/0136685 A1, Pub Date, May 30, 2013 ("the '685 application" or '685 publication), also referred to as "Asserted Patent", and "Baselli Publication", respectively. I have also been asked to compare claims of the Asserted Patent with the "Shocker" products to assess whether these products include the claimed elements of the Asserted Patent.

2

7.      I have reviewed and base my opinions on the Asserted Patent and reading the Baselli Publication, my inspection of the "Shocker" products, materials cited and exhibited in this report, and my education, knowledge, and experience.

## III.    LEGAL PRINCIPLES

8.      It is my understanding that interpretation of the claims, in accord with the understanding of one of ordinary skill in the art at the time of the invention, is the first step in determining whether the claims are infringed.  It is my understanding that the baseline for interpreting claim terms is the ordinary meaning of the claim unless a review of the specification or file history demonstrates that the inventor has used any terms in a manner inconsistent with their ordinary meaning.

9.      In my opinion, a person of ordinary skill in the art related to the Asserted Patent would have a level of skill that includes that obtained via a bachelor's degree in a physical science area, including chemistry.  An advanced degree (PhD) in a scientific area that included research involving solids, liquids and gases, chemical reactions and movement of chemicals / molecules, along with hands-on practical experience in this area, especially using an apparatus and/or involved in a process, would provide appropriate additional background.

10.     It is my understanding that for direct, literal infringement of a claim, each and every element of the claim must be present in the accused device.

11.     It is my understanding that for an accused product or process to infringe a patent under the doctrine of equivalents, the accused product or must perform substantially the same function in substantially the same way to obtain the same result for the particular element of the patent claim.

3

12.     I have expressed my opinion herein as to how one of ordinary skill in the art would interpret certain terms in the claims of the Asserted Patent. It is my understanding that the scope or construction of patent claims is an issue to be decided by the Court. Should the Court construe the claims following submission of this report, I will supplement this report as necessary in light of the Court's claim construction and any relevant information in view of that claim construction. Furthermore, I reserve the right to supplement this report as required in view of any additional analysis, or information that I later acquire.

## IV.     SUMMARY OF OPINIONS

13.     I have expressed herein my opinion as to how one of ordinary skill in the art would interpret certain terms in the Asserted Patent. I have also expressed my opinion as to the level of skill of a person of ordinary skill in the art related to the Asserted Patent. As explained in more detail below, and as I expect to testify at trial or otherwise, I have also formed the following opinions:

14.     In my opinion, each and every element of Claims 1, 3, 8, 9, 10, 11, 12 and 13 of the '661 Patent of the '661 Patent, are present in the use of the "Shocker" products, and as such, the use of the "Shocker" products directly and literally infringes the identified claims.

15.     Should The "Shocker" products be found to not literally infringe Claim 1 of the '661 Patent, then in my opinion, The "Shocker" products infringe these identified claims under the doctrine of equivalents.

## V.     OPINIONS AND THE BASES THEREFORE

### A. Claim 1 of the '661 Patent

16.     Claim 1 of the '661 Patent states:

1. A device for producing an aqueous chlorine dioxide solution when exposed to water comprising:

4

a membrane shell defining a compartment which includes one or more dry chemical components capable of producing chlorine dioxide gas when exposed to water; and

wick means connected to said membrane shell and extending into said compartment for absorbing water and transporting water into said compartment whereby when said device is exposed to water said wick means absorbs water and transports water into said compartment, said chemical component(s) dissolve in the water and produce chlorine dioxide gas in said compartment, and chlorine dioxide gas exits said compartment through said membrane shell.

17.     The "Shocker" product / products are designed to generate or produce chlorine dioxide. In the context of the '661 Patent, the term "aqueous" means the chemical of interest (chlorine dioxide) is dissolved in water. The "Shocker" product functions by being exposed to, is activated by, and, when functioning, is in the presence of, water. By this exposure to water chlorine dioxide is produced, and since chlorine dioxide is a gas which possesses aqueous solubility, that is, it is soluble in water, the use of the "Shocker" product involves the production of an aqueous chlorine dioxide solution of the gas chlorine dioxide. The generation of chlorine dioxide is attested to by the manufacturer, via printing on the foil pouch that contains components of the product, as follows: "Chlorine dioxide disposable micro generator (pouch)." See Fig. 01 for a scan of the portion of the foil pouch on which is printed this information, as well as, for completeness sake, Fig 02 for a scan of the reverse of said foil pouch. The requirement for water with the "Shocker" product is clearly described in step 6 of the instructions that are enclosed with the product: "6. Using measuring cup provided, add one full measuring cup of warm tap water over pouch to activate." See Fig. 03 for a scan of the enclosed instructions that contain this required step.

5

18.    In my opinion, one of ordinary skill in the art would interpret the claim term "a device for producing an aqueous chlorine dioxide solution" to mean that it describes something constructed for the purpose of making chlorine dioxide and that the chlorine dioxide is, at least in part, present as a solution in water.  The described chlorine dioxide-generating device in the '661 Patent may also be described as a "micro generator" and, since it produces chlorine dioxide, it is thus described as being the same as the "Shocker" product, a "chlorine dioxide disposable micro generator (pouch)" where the generator is the device.  Furthermore, since the generation of chlorine by the "Shocker" product requires the use of water, by necessity an aqueous solution of chlorine dioxide is produced, at least in part.  This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning.  This interpretation is consistent with the specification of the asserted patent.

19.    Claim 1 of the '661 Patent further recites that the device for producing an aqueous chlorine dioxide solution when exposed to water is one comprising: "a membrane shell defining a compartment", where membrane has its usual meaning of a thin sheet(s) or layer(s) of material and a compartment its usually meaning of an enclosed space.  Visual and manual examination of the physical "Shocker" device products in my possession reveals a membrane shell that defines a compartment, that is, thin sheets or layers that act as walls, formed in the shape of a square envelope or shell, to create an enclosed space.

20.    In my opinion, one of ordinary skill in the art would interpret the claim term in the '661 patent, "a membrane shell defining a compartment", as a sheet or layer that is constructed or oriented such that the membrane makes up the shell or wall(s) of a compartment or chamber, that is, thin sheets or layers that act or function as walls, formed in the shape of an envelope, to create an enclosed space, a compartment.  Thus, the above-described membrane

6

shell in the '661 Patent is equivalent in function and design to the "Shocker" product in my possession. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

21.    Claim 1 of the '661 Patent further recites of the above-referenced membrane shell defining a compartment that it "…includes one or more dry chemical components… ".  Physical examination of the "Shocker" product clearly shows it to possess a compartment and that this compartment has one or more dry chemical components enclosed therein.  Please refer to Figs. 04 (Marine shocker contents removed from foil pouch), 05 (Marine shocker cut open partially) and 06 (Marine shocker cut open) for photographs of the "Shocker" in various stages of disassembly.  Fig. 06, showing the cut-open membrane shell of the shocker, reveals the contents of the thereby formed compartment.  Note in Fig. 06 the dry chemical(s) in the form of a powder to the right of the photograph present in an inner pouch.

22.    Thus in my opinion, one of ordinary skill in the art would interpret the claim term in the '661 Patent, "…includes one or more dry chemical components… " to be one or more dry chemicals present in the membrane shell.  The one or more dry chemicals visually observed to be contained in the "Shocker" product, present in an inner pouch, would thus be ordinarily interpreted to be equivalent in physical location to the chemical component(s) described in the claim product chemical pouch.  That is, one would conclude my examination of the product indeed shows one or more dry crystals or chemicals to be present in the membrane shell.  Thus, the "Shocker" product includes this element of Claim 1 of the '661 Patent.  This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning.  This interpretation is consistent with the specification of the asserted patent.

7

23.     Claim 1 of the '661 Patent further recites said dry chemical components have the property of being "…capable of producing chlorine dioxide gas". That is, that the chemical(s) that are held within the membrane shell (i.e., in a pouch), can produce chlorine dioxide (a gas). The chemistry by which this chlorine dioxide gas is produced is described in column 2, line 14 of the '661 Patent: $5ClO_2^- + 5H^+ \rightarrow 4ClO_2 + HCl + 2H_2O$, where $ClO_2^-$ is the counter ion of a chlorite-containing salt such as sodium chlorite, $NaClO_2$, and $ClO_2$ is chlorine dioxide. The "$H^+$" represents the active part of an acid component of the system that participates in the reaction such as what would be provided by citric acid. Subsequent to opening up the membrane shell and pouch in the "Shocker" product, a simple olfactory investigation clearly demonstrated a chlorine-like smell emanating from the pouch. Chlorine dioxide is well known to have a chlorine-like smell, thus a chlorine-like smell emanating from the pouch is consistent with the production of chlorine dioxide. As this examination occurred on a relatively humid summer day, I concluded that moisture from the air was functioning to activate the chemical process that results in the production of the chlorine dioxide. The chlorine dioxide was then detected by a chlorine-like smell. Paragraph 0007 of the Baselli publication, which is directed towards the "Shocker" product, discloses "exposure to water to trigger[s] a reaction between small quantities of provided chemicals, such as sodium chlorite and an acid to produce the chlorine dioxide" which is consistent with the described observations.

24.     Thus in my opinion, one of ordinary skill in the art would interpret the claim term in the '661 Patent, "…capable of producing chlorine dioxide gas" to describe a process that is subsequently described in my above observations and that it was clear that one or more chemicals were present "…capable of producing chlorine dioxide gas". Thus, the "Shocker" product includes this element of Claim 1 of the '661 Patent. This interpretation is the ordinary

8

and plain meaning of the claim term, and the specification does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

25.    Claim 1 of the '661 Patent further recites that the chemical components are capable of producing chlorine dioxide gas "when exposed to water…". As discussed above, the instructions that are included in the Marine Shocker product for use of the "Shocker" include step "6" which states in part that the user must "add one full measuring cup of warm tap water over pouch to activate." [Please refer to the scanned instructions, Fig 03].

26.    Thus in my opinion, one of ordinary skill in the art would interpret the claim term, that the chemical components are capable of producing chlorine dioxide gas "when exposed to water…" to be the same as step 6 in the instructions that are included in the Marine Shocker product for use of the "Shocker", which states in part that the user must "add one full measuring cup of warm tap water over pouch to activate". In plain language, exposure to water is a necessary step in the function of the "Shocker" and that this necessary step is an activation step. Production of chlorine dioxide gas naturally follows the activation. Thus, the "Shocker" product includes this element of Claim 1 of the '661 Patent. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

27.    Claim 1 of the '661 Patent further recites that the device for producing an aqueous chlorine dioxide solution when exposed to water is one comprising "…wick means connected to said membrane shell and extending into said compartment…". This claim term relates to the connection, and thus is related to the location, of the wick means. For the purposes of the instant invention, the "wick means" (plural) are described in the first paragraph in the Summary of the Invention as the following, along with "wick member" (singular): "Wick means are

9

connected to the membrane shell and extend into the compartment...". A commonly accepted definition of a "wick" may be found in Funk & Wagnalls Standard® College Dictionary [Harcourt, Brace & World, Inc., New York, 1963] as "*n*. A band of loosely twisted or woven fibers, as in a candle or lamp, acting by capillary attraction to convey oil or other illuminant to a flame." Thus in common parlance a thread or a woven fabric or fibers or intimately (closely) associated regions of an object (as one would find in a twine or in paper towel or in a sponge) would be a wick. The placement of the wick means / wick member is clear: they are connected to the membrane shell and extend into the compartment. However, it is important to note the description in column 6, line 35 of the '661 Patent: "The wick member 24 can be connected to the membrane shell 22 by being directly or indirectly fastened to a portion of the shell or by being merely inserted into the compartment 30." Claim 1 is thus broad in this description of the meaning of "connected". Claim 1 of the '661 Patent does not restrictively describe the functional point of origin of the wick means, the physical location, or area where the wick is initially exposed to water, the location or area where water enters the wick means, only the location to which the water is transported, that is, into "said compartment". The wick means may be structurally attached to the membrane shell, as with a thread, or may simply be attached by fact of location, or other means, or may be merely inserted into the compartment, such as a sponge fragment placed in an envelope. Nothing else is implied as to location as is specified in claim 1. Examination of the "Shocker" product similarly reveals a plurality structures in a location where they satisfy the above description of the connection of the "wick", that is, that it they are merely inserted into the compartment of the "Shocker" product. Refer to the plurality of yellow objects clearly depicted in Figs. 5 and 6. Note that the yellow objects were described as

10

"cellulose pellets" in the third paragraph, (in rightmost column) on page 11 in "SMM's objections and responses to plaintiffs' first set of interrogatories", Exhibit 4.

28.     Thus in my opinion, one of ordinary skill in the art would interpret the claim term "Wick means are connected to the membrane shell and extend into the compartment…" as there is a wicking material (the wick means / wick member) that is in connection with the membrane shell (the shell being the outside of the device).  As per the '661 Patent, "The Wick member 24 can be connected to the membrane shell 22 by being directly or indirectly fastened to a portion of the shell or by being merely inserted into the compartment 30", (See column 6, line 34of the '661 Patent) clearly mere insertion into the membrane shell satisfies this claim term.   Since observation of the "Shocker" product reveals numerous yellow objects (cellulose pellets) are inserted within the device (inside the membrane shell) the yellow objects (cellulose pellets) present in the "Shocker" are clearly what is described in claim 1 of the '661 Patent.  Thus, the "Shocker" product includes this element of Claim 1 of the '661 Patent.  This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning.  This interpretation is consistent with the specification of the asserted patent.

29.     Claim 1 of the '661 Patent further recites that the device described therein comprises a wick means connected to said membrane shell and extending into said compartment "… for absorbing water and transporting water into said compartment whereby when said device is exposed to water said wick means absorbs water and transports water into said compartment…".  For the purposes of the instant invention, the "wick means" (plural or singular) along with "wick member" (singular) are described in the first paragraph in the Summary of the Invention as the following: "Wick means are connected to the membrane shell and extend into the compartment for absorbing water and transporting water into the

11

compartment whereby when the device is exposed to water the wick member absorbs water and transports water into the compartment" [column 2, line 30]. The instant invention described in the '661 Patent teaches that the "wick means" act in a fashion similar to the wick described in the dictionary definition (see above). In the '661 Patent, as it relates to this portion of Claim 1, the "wick means" are described functionally, as items that act to convey, or transport water to a particular location, in this case "into the compartment". A simple test was performed to determine if the plurality of yellow objects (cellulose pellets) effectively function in a similar fashion. The addition of a few drops of water to one of the yellow squares resulted in the square expanding to many times its original size, assuming the visual appearance of a sponge. The results of this test clearly demonstrate that the yellow objects (cellulose pellets) have properties that are like that of a sponge and exhibit the properties of capillary attraction. When a liquid wets a surface (contact angle less than 90°) it moves along the surface due to this attraction. Since the cellulose pellets are made of cellulose, and since cellulose is well known to have a water contact angle of less than 90° then water will move along its surface due to the described attraction. The yellow objects (cellulose pellets) will, by their physical chemistry nature, exhibit capillary action. By this process the sponges function as wick members that is, they would be expected to function in a fashion described in the '661 Patent.

30.     In my opinion, one of ordinary skill in the art would interpret the claim terms "wick means" or, "wick member" as a structure(s) of some sort that conveys or transports water into a compartment. The wick means / wick member would have a close association of threads or fibers or a network of sorts, or would be thread-like or paper-like or fabric-like or sponge-like in nature. Fluids, specifically water, would be drawn along it, as would be expected by capillary attraction (capillary action) between or along the threads or fibers or network. This

12

interpretation also describes the observations, described above, made of the yellow objects (cellulose pellets) found to be present in the "Shocker". Therefore, the yellow objects (cellulose pellets) function as wick means / wick member and are thus described in Claim 1 of the '661 Patent. Thus, the "Shocker" product includes this element of Claim 1 of the '661 Patent. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

31.    Claim 1 of the '661 Patent further recites that "said chemical component(s) dissolve in the water and produce chlorine dioxide gas in said compartment...". Sodium chlorite is described as being present in as an active ingredient in the "Shocker" product (see Fig. 1).  It has the following solubility in water (g/100g soln): at 5°C (41°F): 34; at 17°C (62.6°F): 39; at 30°C (86°F) 46; at 45°C (113°F): 53, and at 60°C (140°F) 55 (see Merck Index, Eleventh Edition, entry 8545).  Thus, due to solubility considerations alone, it is clear that the chemical component of the "Shocker", sodium chlorite, is considered to have properties such that it will dissolve in water.  Furthermore, sodium chlorite is well known to produce chlorine dioxide gas (see Merck Index, Eleventh Edition, entry 8545).

32.    In my opinion, one of ordinary skill in the art would interpret the claim terms that "said chemical component(s) dissolve in the water and produce chlorine dioxide gas in said compartment..." to clearly mean that sodium chlorite (one of the chemical component) will dissolve in water and produce chlorine dioxide gas in the compartment (the compartment defined by the membrane shell as described previously).  Since sodium chlorite is present as the active ingredient in the "Shocker" product, and since sodium chlorite is well known to dissolve in water, and since chlorine dioxide is stated to be produced in the Shocker product, the Shocker

13

product is clearly described by the recited claim terms. Thus, the "Shocker" product includes this element of Claim 1 of the '661 Patent. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

33.     Claim 1 of the '661 Patent further recites that "chlorine dioxide gas exits said compartment through said membrane shell". The '661 patent clearly describes a device that is so constructed as to permit the exit of a gas, that is, permeable to gas. The gas described is, in specific, chlorine dioxide gas. For example, as recited in the '661 Patent, "in one embodiment the membrane shell is substantially impervious to liquid (e.g., water) but permeable to gas (e.g., chlorine dioxide gas). In another embodiment, the membrane shell is permeable to both liquid (e.g., water) and gas (e.g., chlorine dioxide gas)" [see column 3, lines 52-56 in the '661 Patent]. Thus the permeation of chlorine dioxide gas is described in the '661 Patent. Also, for particular applications, "the membrane shell can include a plurality of small openings for facilitating the passage of liquid (e.g., water) into and out of the device…" [see column 4, lines 42-44 in the '661 Patent]. Again, here and elsewhere, the permeation of chlorine dioxide gas is described in the '661 Patent. The "Shocker" membrane has the visual and tactile properties of a piece of paper. A simple test demonstrates that the "Shocker" membrane permits the passage of a gas, that is, is permeable to a gas. Simple blowing on this "Shocker" membrane allows air (a gas) to pass through without it tearing or breaking up in any fashion, showing that it is porous or permeable to the movement of air. It is thus permeable to gas.

34.     In my opinion, one of ordinary skill in the art would interpret the claim term in the '661 Patent, that "chlorine dioxide gas exits said compartment through said membrane shell" to simply mean that chlorine dioxide leaves (exits) the compartment through the envelope

14

forming the compartment (the membrane shell). This process clearly describes the means by which chlorine dioxide exits the compartment present in the "Shocker" as well. Thus, the "Shocker" product includes this element of Claim 1 of the '661 Patent. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

35.      In conclusion, as discussed in the above paragraphs, the "Shocker" product includes each and every element of Claim 1 of the '661 Patent.

*B. Claim , 3, 8, 9, 10, 11, 12 and 13 of the '661 Patent*

36.      Claim 3 of the '661 Patent recites: "The device of claim 1 wherein said membrane shell is permeable to liquid and gas". The permeability of the membrane shell of the device described in the '661 has been described as permeable to liquid and gas. For example, in column 3, line 54-56 it is recited: "In another embodiment, the membrane shell is permeable to both liquid (e.g., water) and gas (e.g., chlorine dioxide gas)." By necessity, the membrane shell of the "Shocker" is permeable to both liquid (e.g., water) and gas (e.g., chlorine dioxide gas), since the components of the "Shocker" system are sealed in an envelope (equivalent to the membrane shell) that must admit water and allow the passage of gas (e.g. chlorine dioxide gas). Physical examination of the "Shocker" outer envelope (membrane shell) shows this is indeed the case.

37.      In my opinion, one of ordinary skill in the art would interpret the claim term "The device of claim 1 wherein said membrane shell is permeable to liquid and gas" as simply meaning that liquid and gas can move through the outer envelope, the membrane shell. As outlined above, this claim term describes the "Shocker" as well. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

15

38.     Claim 8 of the '661 Patent recites: "The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component whereby when water is transported into said compartment metal chlorite and acid in said compartment dissolve in the water and react to produce chlorine dioxide in said compartment." Paragraph 0007 of the Baselli publication recites that their described device is a: "chlorine dioxide micro generator that uses exposure to water to trigger a reaction between small quantities of provided chemicals, such as sodium chlorite and an acid to produce the chlorine dioxide." Thus the use of water and a metal chlorite component (of which sodium chlorite is a member) and an acid are employed for chlorine dioxide generation as described in the Baselli publication in a fashion substantially identical to that recited in Claim 8 of the '661 Patent.

39.     In my opinion, one of ordinary skill in the art would interpret the claim term "The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component whereby when water is transported into said compartment metal chlorite and acid in said compartment dissolve in the water and react to produce chlorine dioxide in said compartment" as simply meaning that a metal chlorite (such as sodium chlorite) and an acid will dissolve in water and produce chlorine dioxide. This is substantially identical what is described in the referenced Baselli publication and thus the Baselli publication includes this element of Claim 8 of the '661 Patent, and, to the extent that Baselli publication is descriptive of the "Shocker" product, the "Shocker" product also includes this element of Claim 8 of the '661 Patent. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

16

40.     Claim 9 of the '661 Patent recites: "The device of claim 8 wherein said metal chlorite component comprises a metal chlorite selected from the group consisting of alkali metal chlorites and alkaline earth metal chlorites." Fig. 1 shows that sodium chlorite is present in the "Shocker" product.  Since sodium is a metal, and is part of the group of metals known as "alkali" metals, the "Shocker" product clearly is described in claim 9 of the '661 patent.  As mentioned above, the Baselli publication recites that sodium chlorite is employed in their described device. Thus the use sodium chlorite as described in the "Shocker" instructions and Baselli publication is identical to that recited in Claim 9 of the '661 Patent.

41.     In my opinion, one of ordinary skill in the art would interpret the claim term: "The device of claim 8 wherein said metal chlorite component comprises a metal chlorite selected from the group consisting of alkali metal chlorites and alkaline earth metal chlorites" as describing the use of sodium chlorite, since sodium is commonly known to be an alkali metal. Thus the "Shocker" product includes this element of Claim 9 of the '661 Patent.  This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning.  This interpretation is consistent with the specification of the asserted patent.

42.     Claim 10 of the '661 Patent recites: "The device of claim 9 wherein said metal chlorite component comprises a metal chlorite selected from a group consisting of sodium chlorite, potassium chlorite, barium chlorite, calcium chlorite and magnesium chlorite".  In a fashion similar to that described from Claim 9, above, Fig. 1 shows that sodium chlorite is present in the "Shocker" product.  Since sodium chlorite is described as being present in the "Shocker" product, the "Shocker" product clearly is described in claim 10 of the '661 patent. As mentioned above the Baselli publication recites that sodium chlorite is employed in their

17

described device. Thus the use sodium chlorite as described in the "Shocker" instructions and Baselli publication is identical to that recited in Claim 10 of the '661 Patent.

43.     In my opinion, one of ordinary skill in the art would interpret the claim term: "The device of claim 9 wherein said metal chlorite component comprises a metal chlorite selected from a group consisting of sodium chlorite, potassium chlorite, barium chlorite, calcium chlorite and magnesium chlorite" as including the use of sodium chlorite. Thus the "Shocker" product, which employs sodium chlorite in their product, includes this element of Claim 10 of the '661 Patent. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

44.     Claim 11 of the '661 Patent recites: "The device of claim 10 wherein said metal chlorite component is sodium chlorite". In a fashion similar to that described in the previous claims, above, Fig. 1 shows that sodium chlorite is recited as being present in the "Shocker" product. Since sodium chlorite is described as being present in the "Shocker" product, the "Shocker" product clearly is described in claim 11 of the '661 patent. As mentioned above, the Baselli publication also recites that sodium chlorite is employed in their described device. Thus the use sodium chlorite as described in the "Shocker" instructions and Baselli publication is identical to that recited in Claim 11 of the '661 Patent.

45.     In my opinion, one of ordinary skill in the art would interpret the claim term: "The device of claim 10 wherein said metal chlorite component is sodium chlorite" clearly shows the use of sodium chlorite. Thus, the "Shocker" product, which employs sodium chlorite in their product, includes this element of Claim 11 of the '661 Patent. That is, the "Shocker" product includes this element of this Claim of the '661 Patent. This interpretation is the ordinary

18

and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

46.     Claim 12 of the '661 Patent recites: "The device of claim 8 wherein said acid component comprises an acid selected from the group consisting of citric acid, lactic acid, tartaric acid, maleic acid, malic acid, glutaric acid, adipic acid, acidic acid, sulfamic acid, formic acid, sulfuric acid, hydrochloric acid and phosphoric acid." Paragraph 0006 of the Baselli publication recites the use of "Citric acid, sodium bisulfate, hydrochloric acid, etc.".

47.     In my opinion, one of ordinary skill in the art would interpret the claim term: "The device of claim 8 wherein said acid component comprises an acid selected from the group consisting of citric acid, lactic acid, tartaric acid, maleic acid, malic acid, glutaric acid, adipic acid, acidic acid, sulfamic acid, formic acid, sulfuric acid, hydrochloric acid and phosphoric acid" to clearly mean that the mentioned acids, including citric acid and hydrochloric acid, are acids that may be employed in the device. Since the Baselli publication refers to the use of "Citric acid, sodium bisulfate, hydrochloric acid, etc.", which include the citric acid and hydrochloric acid recited in Claim 12 of the '661 Patent, to the extent that the Baselli publication is descriptive of the "Shocker" product, the "Shocker" product also includes this element of Claim 12 of the '661 Patent. This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning. This interpretation is consistent with the specification of the asserted patent.

48.     Claim 13 of the '661 Patent recites: "The device of claim 12 wherein said acid component is citric acid". As described above, Paragraph 0006 of the Baselli publication recites the use of "Citric acid, sodium bisulfate, hydrochloric acid, etc.". Thus citric acid is a component as described by the Baselli publication.

19

49.     In my opinion, one of ordinary skill in the art would interpret the claim term: "The device of claim 12 wherein said acid component is citric acid" to clearly mean that citric acid is a specific acid that may be employed in the device.  Since the Baselli publication refers to the use of "Citric acid, sodium bisulfate, hydrochloric acid, etc.", which includes the citric acid recited in Claim 13 of the '661 Patent, to the extent that the Baselli publication is descriptive of the "Shocker" product, the "Shocker" product also includes this element of Claim 13 of the '661 Patent.  This interpretation is the ordinary and plain meaning of the claim term, and the '661 Patent does not contravene this plain meaning.  This interpretation is consistent with the specification of the asserted patent.

50.     In further conclusion, as discussed in the above paragraphs, the "Shocker" product includes each and every element of Claim 3, 8, 9, 10, 11, 12 and 13 of the '661 Patent.

## VI.   <u>CONCLUSIONS</u>

51.    The analysis described above clearly shows that the "Shocker" product includes each and every element of Claims 1,3, 8, 9, 10, 11, 12 and 13 of the '661 Patent.

I reserve the right to supplement, update and/or modify this report or my testimony at trial or otherwise based on further analysis or on information that may later be provided to me, including but not limited to, expert reports or other documents provided by any of the defendants.

Date: July 29, 2013        Signature: _____
                           Louis DeFilippi, Ph. D.

21

**Dr. Louis J. DeFilippi**                           Updated: July 2013
Louis DeFilippi, LLC
208 Edgewood LN
Palatine, IL 60067
United States of America

Phone:  1-847-925-8524
Email:   LouisDeF@Expertbiochemist.com -or- defilip1@flash.net

Expertise: Private Consulting; Expert Witness

| **Expert in Biotechnology (enzymes), Environmental (bioremediation), Regulatory Compliance (OSHA / EPA), Patent Infringement; Expert Witness** | |
|---|---|
| analytical biochemistry | Dr. DeFilippi has over 37 years of energetic |
| analytical chemistry | experience in both basic and applied Chemistry, |
| antimicrobials | Biochemistry (biochemical research and |
| bacteria | enzymology), Biotechnology, and Fermentation |
| biocatalysis | science. He is very successful in finding flaws in |
| biochemical research | published and spoken materials. His strengths |
| biochemistry | are in the fields of physical biochemistry, protein |
| biomedical | biochemistry, protein characterization, protein |
| bioprocessing | modification, protein stabilization, enzymology |
| biotransformation | and protein structure, as well as applied |
| catalysis | microbiology. He has successfully applied |
| chiral transformations | continuous processes using immobilized |
| chromatography | enzymes and whole cells to effect enzymatic |
| contact lens polymers | transformations (biocatalysis and |
| cytochrome | biotransformations).  In the area of separations |
| enzyme | science he has hands-on success with |
| enzyme characterization | chromatography applications, as he has |
| enzyme purification | employed adsorption chromatography, as well as |
| enzymology | ion exchange and gel permeation |
| fermentation | chromatography (column and TLC) for small |
| food science | molecule and protein isolation, and protein / |
| free radical chemistry & biochemistry | enzyme purification. A protein concentration |
| fungi | process, usually via membranes and pressure |
| gel permeation chromatography | filtration, followed the purifications. He has |
| hemoglobin | experience with both mammalian (red blood cell, |
| high-performance liquid chromatography | heart, liver) and microbial systems.  Some |
| personal care industry | enzymes that he purified and studied were |
| immobilized enzymes | hemoglobin, methemoglobin, methemoglobin |
| latex | reductase, cytochrome b5 reductase, cytochrome |
| lipase | b5, superoxide dismutase, IgG, glutathione |
| mammalian | reductase, and numerous other proteins / |
| oxidation and reduction reactions | enzymes such as cytochrome P-450, oxidative |
| pig liver esterase | enzymes, oxidoreductase.  He has commercially |
| protease | applied a number immobilized enzymes |
| protein biochemistry | [biotransformations as applied enzymology in |
| protein characterization | biochemical process development] including: |
| protein concentration process | alpha amylase, glucoamylase, glucose |
| protein isolation | isomerase [HFCS production], lipases, esterases |
| protein modification | [PLE, pig liver esterase; stereoselective and |
| protein purification | regioselective hydrolysis and transesterifications] |

| | |
|---|---|
| protein stabilization<br>protein structure<br>red blood cells – erythrocytes<br>regioselective hydrolysis<br>separations science<br>starch (alpha amylase, glucoamylase)<br>stereoselective transformations<br>sugar (glucose isomerase)<br>UV/Vis spectrophotometry | and proteases, for the food, pharmaceutical and home care industries.  He is very familiar with HPLC (high-performance liquid chromatography) and associated detectors.  He is very strong in analytical biochemistry and has experience in managing an analytical biochemistry laboratory where such techniques as UV/Vis spectrophotometry, GC/MS, ion chromatography and the like were in common usage.  He studied free radical, oxidation and reduction chemistry and biochemistry and showed negative effects on various blood proteins and related it to peroxidase (HRP).<br><br>He fast-tracked the installation and validation of a biochemistry / biotechnology protein and enzymology laboratory for the cGMP production of an immobilized enzyme in commercial quantities for use in preparing a pharmaceutical intermediate for an AIDS drug.  He supervised the analytical, quality control [QA/QC] and production aspects of the project.<br><br>He also has extensive fermentation experience having grown numerous microorganisms, including bacteria, fungi and yeasts.  He has studied and applied antimicrobial agents.<br><br>He has extensive biomedical experience, especially as it relates to antimicrobial agents and contact lens polymers, latexes and biochemical methods for allergen reduction. |
| activated carbon adsorption<br>adsorption, desorption and movement of small molecules<br>anaerobic industrial wastewater digestion<br>bioremediation<br>chlorinated solvents<br>biochemical oxygen demand reduction<br>biological industrial wastewater treatment<br>biological air treatment<br>biofiltration<br>coal tar<br>groundwater treatment<br>halogenated solvents<br>industrial wastewater treatment<br>Langmuir isotherms<br>laboratory analyses<br>mold<br>reverse osmosis<br>toxic substance contaminated water treatment<br>wastewater treatment | Dr. DeFilippi has over 23 years experience in the commercial environmental, wastewater and air treatment areas, focusing on biological approaches. He is familiar with many areas of wastewater treatment, focusing on industrial wastewater treatment. Examples of experience include, but are not limited to, biological industrial wastewater treatment such as the biological treatment of Manufactured Gas Plant (MGP)-impacted (contaminated) groundwater, fixed film reactors for reduction of biochemical oxygen demand (BOD) and COD, drinking water organics control using both biological treatment and activated carbon adsorption, anaerobic industrial wastewater digestion, both for sludge reduction and for co-metabolic treatment of halogenated hydrocarbons such as TCE, and nitrated compounds such as TNT and DNT (pink water), drinking water purification, especially ammonia nitrification – denitrification and BOD reductions as applied to the Space Station water recycling, in-situ groundwater treatment (toxic substance contaminated water treatment) using biological systems, and wastewater recycling, |

2

| | |
|---|---|
| | especially for the semi-conductor industry. |
| anhydrous ammonia<br>Chemical process safety engineering<br>EPA<br>TSCA<br>SARA Title III (Emergency Planning and Community Right to Know Act: EPCRA)<br>HACCP: Hazard Analysis and Critical Control Points<br>Occupational Safety and Health Administration – OSHA<br>mold inspections, growth and contamination<br>PSM [1910.119 Process Safety Management] –<br>RMP [112r Risk Management Planning]<br>root cause analysis<br>site inspections for insurance claims<br>USDA - Food Safety and Inspection Service (FSIS) regulations<br>sanitation SOPs<br>(SSOPs)worker safety | Dr. DeFilippi has over 17 years experience in the regulatory field, focusing on such areas as chemical process safety engineering.  He has been very successful in representing clients involved in alleged violation of OSHA and EPA regulations.  He has worked with numerous clients to achieve compliance with various regulations, including SARA Title III (EPCRA, the Emergency Planning and Community Right to Know Act:), EPA 112r (Risk Management Planning, RMP), TSCA (Toxic substances) regulations, especially involving PCBs & transformers, Occupational Safety and Health Administration (OSHA) regulations [especially 29 CFR 1910.119, Process Safety Management (PSM, often focusing on anhydrous ammonia) and other areas such as 29 CFR 1910.146 and 29 CFR 1910.1030, confined space safety, etc., mold inspections, accident investigation and root cause analysis, often relating to insurance claims.  He also has significant experience in USDA Food Safety and Inspection Service (FSIS) regulations, especially HACCP (Hazard Analysis and Critical Control Points) and Sanitation SOPs. Much of his work has involved the food and beverage areas, especially involving ammonia refrigeration, and the chemical areas. |
| Expert witness and patent infringement | Dr. DeFilippi has successfully applied his knowledge and expertise gained by working in the above areas to his work as an expert witness in multiple litigation and patent infringement cases. |

Education

| Year | Degree | Subject | Institution |
|---|---|---|---|
| 1978 | Post Doctoral Scholar | Biochemistry | Cornell University |
| 1976 | PhD | Biological Chemistry | The University of Michigan |
| 1971 | BA | Chemistry (honors / ACS Certified) | Queens College, CUNY |

3

Work History:

| Begin | End | Employer | Department | Title | Responsibilities |
|---|---|---|---|---|---|
| 1999 | Current | Louis DeFilippi LLC | Independent Consultant | President and Member | He is currently a senior consultant, president and founder. His focus is on (1) Biotechnology using immobilized enzymes to produce value-added chemicals, ingredients, pharmaceutical intermediates, (2) Immobilized cells for industrial wastewater treatment and (3) Regulatory (OSHA, EPA) compliance |
| 1995 | 1999 | Sole Proprietorship | Independent Consultant | Self | His focus was on (1) biotechnology using immobilized enzymes to produce pharmaceutical intermediates, (2) Immobilized cells for industrial wastewater treatment and (3) Regulatory (OSHA, EPA) compliance |
| 1996 | 1997 | AlliedSignal (now Honeywell) | Aerospace / Biotechnology | Project leader | He was project leader involving the use of immobilized microorganisms and hollow fiber membranes for total water recycle process for the Mars Lander/Space Station |
| 1994 | 1995 | AlliedSignal | Environmental Systems and Services | Manager | He applied the use of immobilized cells for the biological treatment of hazardous waste and aided in the commercialization as co-founder of the Environmental Systems and Services business unit. |
| 1985 | 1994 | AlliedSignal Research & Technology | Biochemistry | Research Scientist | In this capacity he invented and patented a number of new technologies and materials for wastewater and groundwater pretreatment (received Special Awards) based upon immobilized cell technology. |

4

| 1982 | 1985 | Signal-UOP Research Center | Biochemistry | Research Specialist | During this period of time his area of work was quite diverse, involving biochemistry, the corn wet milling area, immobilized enzymes, anti-microbial pharmaceuticals, coating technology and electro-biochemistry |
|------|------|----------------------------|--------------|---------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 1978 | 1982 | UOP Research Center | Biotechnology and Chemistry | Senior Research Biochemist | In this position his work focused on the industrial application of immobilized enzymes used in continuous processes. |

## Career Accomplishments

*Associations/Societies:*

American Chemical Society

*Licenses/Certifications:*

He has special training: · HAZWOPPER Refresher Training (8 hour Haz. Waste Operations Management), 1991 to Current (2013) · Emergency Notification Release Reporting Training, EPCRA 304; CERCLA 103 (EPA Region 5), 1999 · Risk Management Program Assistance (IEMA), 1999 · Basic Ammonia Refrigeration, 1998 · Statistical Design of Experiments (DOE), 1996. · Scorecard Training, 1996 · Convenor, Pollution Prevention Biotechnology, Summer Biotechnology Institute, Northwestern University Center for Biotechnology, 1995 · Sales Training Workshop (Institute for Business and Interpersonal Strategies) 1995 · Customer Linked Commercialization & Customer Partnering, 1994.

*Professional Appointments:*

He was appointed Trustee, Plum Grove Estates Sanitary District, by the Cook County, Illinois, Board of Commissioners in 2005 and is actively serving in this capacity.

*Awards/Recognition:*

Dr. DeFilippi has received a number of awards and recognition, including: • Special (Team) Recognition Award, AlliedSignal, April, '95 • Special (Individual) Recognition Award, AlliedSignal, May, '92 • Rackham Dissertation Grant, The University of Michigan, '74-'75 • Graduated (BA, Queens College) with departmentally-conferred honors, '71 • Elected to Beta Delta Chi, Chemistry Honor Society, Queens College, CUNY, '71 • New York State Regents Scholarship, '67-'71.

*Medical/Professional:*

Honors research, in the laboratory of Prof. Robert Engel, Queens College, CUNY, January 1970 through August 1971

*Publications and Patents:*

5

Dr. DeFilippi has authored approximately 22 publications, 3 book chapters, and is an inventor on approximately 16 issued patents in biotechnology, including the chemical, food, pharmaceutical and environmental industries; co-Editor & author, John Wiley & Sons, "Biological Treatment of Hazardous Wastes" 1998.

**Patents and Publications (recent / representative):**

| Author | Year | Title | Publisher | Abstract |
|---|---|---|---|---|
| Laszlo, J. A., Compton, D. L., DeFilippi, L. J. and Grall, S, | 2013 | Compositions Comprising a UV-Absorbing Chromophore [8,357,353] | United States Patent and Trademark Office (USPTO) | This patent is follows up on the previous three patents and involves a chemical composition comprising a linker agent and a compound comprising at least one UV-absorbing chromophore. |
| DeFilippi, Louis J., Grall, Steven, G., Kinney, James F., Laszlo, Joseph A., Compton, David L. | 2010 | Formulations with Feruloyl Glycerides and Methods of Preparation [7,744,856] | USPTO | This patent describes the invention of a product for topical application comprising at least one UV-absorbing chromophore, especially one produced enzymatically via an immobilized lipase, from soybean oil and an ester of the natural product, ferulic acid. |
| Laszlo, J. A., Compton, D. L., DeFilippi, L. J. and Grall, S, | 2010 | Compositions Comprising a UV-Absorbing Chromophore [7,727,514] | USPTO | This is a composition of matter patent that describes the invention of a UV-absorbing chromophore, especially one produced enzymatically via an immobilized lipase, from soybean oil and an ester of the natural product, ferulic acid. |
| Laszlo, J. A., Compton, D. L., DeFilippi, L. J. and Grall, S, | 2009 | Methods of Making Composition Comprising a UV-Absorbing Chromophore [7,572, 610] | USPTO | This patent describes the enzymatic method for transesterifying soybean oil with an ester of a chromophore, especially ferulic acid, for the production of a substituted acylglycerol. |
| Turner, R.J., Aikens, J., Royer, S., DeFilippi, L., Yap, A., Holzle, D., Somers, N., Fotheringham, I.G. | 2004 | D-Amino Acid Tolerant Hosts for D-Hydantoinase Whole Cell Biocatalysts | Engineering in Life Sciences | Whole cell biocatalysts which enable the concerted use of D-hydantoinase, D-carbamoylase, and racemase enzymes, valuable for the production of D-amino acid, were constructed by deletion of genes coding for D-amino acid destroying enzymes, and used for the biosynthesis of D-amino acids using the hydantoinase system. |
| DeFilippi, L. J. and Lupton, F. S. | 2002 | Biologically Active Support Containing Bound Adsorbent Particles and Microorganisms for Waste Stream | USPTO | This patent describes a support for microorganisms useful in degrading pollutants.  In one embodiment, the support is comprised of polymer foam coated with a low Tg polymer imbedded with activated carbon. |

| | | Purification [6,395,522] | | |
|---|---|---|---|---|
| DeFilippi, L. J. | 1996 | Support Containing Particulate Adsorbent and Microorganisms for Removal of Pollutants [5,580,770] | USPTO | This patent describes a support for microorganisms useful in degrading pollutants. In one embodiment, the support is comprised of polymer foam coated with a low Tg polymer imbedded with activated carbon. |

Refer to addendum for complete list of patents and publications.

*Litigation, Professional Enrichment and Organizational Experience*

Expert Witness examples:

He has been an expert witness on a number of cases and has yet to be on the losing side. Some examples are:
– Gave deposition, at request of MWRDGC attorneys (plaintiff), relating to allegation that company AY (defendant, an ex-client) was inappropriately discharging high-strength wastewater.
– In another case, supervised the collecting of chemical data for defendant and wrote report outlining how alleged groundwater contamination at plaintiff residence was below state drinking water regulations… Gave deposition on same …Opposing attorney of case (plaintiff) agreed to settle out of court due to strength of data, report and deposition.
– In another case, consulted for plaintiff in patent infringement case relating to the use of microorganisms to aid in the degreasing of machine parts.
– In another case, gave deposition on behalf of plaintiff on alleged groundwater contamination of drinking water with benzene and other petroleum components. Also performed calculations based upon EPA data showing poor degree of effectiveness for activated carbon to remove the described contaminants as compared to EPA drinking water standards. Opposing attorneys of above case (defendants) settled out of court due to strength of data, report and deposition.
– In another case consulted & performed Expert Witness duty for defendant; wrote detailed technical critique / report; presented deposition; reviewed expert report involving function of bacteriostatic and bactericidal additives in vacuum cleaner components. Settled out of court, three days before commencement of trial.
– In patent infringement case performed duty as Expert Witness for defendant involving protease enzymes and latex allergens; presented testimony at evidentiary hearing. Judge ruled DeFilippi's testimony "compelling".

Training/Seminars:

Presented as Invited Speaker, to Environmental Practice Specialty, American Society of Safety Engineers ASSE Headquarters, 1800 Oakton, Des Plaines, IL, USA. "Thoughts on International Trends (China) and Emerging Water Issues" April 13, 2007

Vendor Selection:

In order to complete a high priority project for a major pharmaceutical firm, he procured, installed, organized and validated a bioanalytical laboratory in six weeks

7

**Louis DeFilippi, PhD**
## REVIEWED PUBLICATIONS

Kabak, J., DeFilippi, L., Engel R. and Tropp, B., "Synthesis of the Phosphonic Acid Isostere of Glycerol 3-Phosphate," *J. Medicinal Chem.* **15**, p. 1074, 1972.  [Note incorrect spelling of name as "DeFilippe" in publication].

DeFilippi, L. J. and Hultquist, D. E., "A Microscale Isolation of Hemins from Hemeproteins by Use of Polyacrylamide Gel Electrophoresis," *Arch. Biochem. Biophys.* **170**, pp. 670-675, 1975.

Dean, R. T., DeFilippi, L. J. and Hultquist, D. E., "Esterification of Hemins with Trimethyloxonium Tetrafluoroborate," *Anal. Biochem.* **76**, pp. 1-8, 1976.

DeFilippi, L. J. and Hultquist D. E., "High-Pressure Liquid Chromatography and Field Desorption Mass Spectroscopy of Heme *a*, Heme *a* Dimethyl Ester and Acetyl Heme *a* Dimethyl Ester," *Biochim. et Biophys. Acta* **498**, pp. 395-402, 1977.

DeFilippi, L. J. and Hultquist D. E., "High-Pressure Liquid Chromatography and Field Desorption Mass Spectrometry of Heme *a*, Heme *a* Dimethyl Ester and Acetyl Heme *a* Dimethyl Ester," Errata, *Biochim. et Biophys. Acta* **500**, pp. 445, 1977.

Weiss, L., Wolff, J., Knowles, F. C., DeFilippi, L. J. and Gibson, Q. H., "Synthesis and Characterization of *N*-(2,4-Diphosphobenzyl)-1-Amino-5-Naphthalenesulfonic Acid, a New Fluorescent Analogue of Diphosphoglyceric Acid," *J. Biol. Chem.* **253** (7), pp. 2380-2385, 1978.

DeFilippi, L. J. and Hultquist, D. E., "The Green Hemoproteins of Bovine Erythrocytes, I. Purification and Characterization," *J. Biol. Chem.* **253** (9), pp. 2946-2953, 1978.

DeFilippi, L. J. and Hultquist, D. E., "The Green Hemoproteins of Bovine Erythrocytes, II. Spectral, Ligand-Binding, and Electrochemical Properties," *J. Biol. Chem.* **253** (9), pp. 2954-2962, 1978.

DeFilippi, L. J., Toler, L. S. and Hultquist, D. E., "Reactivities of Hydroxylamine and Sodium Bisulfite with Carbonyl-Containing Haems and with the Prosthetic Group of the Erythrocyte Green Haemoproteins," *Biochem J.* **179**, pp. 151-160, 1979.

DeFilippi, L. J., Ballou, D. P. and Hultquist, D. E., "Reaction of Bovine Erythrocyte Green Hemoprotein with Oxygen and Hydrogen Peroxide," *J. Biol. Chem.* **254** (15), pp. 6917-6923, 1979.

Xu, F., DeFilippi, L. J., Ballou, D. P., and Hultquist, D. E., "Peroxide-dependent Formation and Bleaching of the Higher Oxidation States of Bovine Erythrocyte Green Hemoprotein" *Arch. Biochem. Biophys.* **301** (15), pp. 184-189, 1993.

Turner, R.J., Aikens, J., Royer S., DeFilippi, L. Yap, A., Holzle, D., Somers, N., Fotheringham, I. G., "D-Amino Acid Tolerant Hosts for D-Hydantoinase Whole Cell Biocatalysts" *Engineering in Life Sciences.* **4** (6), pp. 517-520, 2004.

## ABSTRACTS, PROCEEDINGS AND PUBLISHED LECTURES

DeFilippi, L. J. and Hultquist, D. E., "Isolation of Hemes from Hemeproteins Using Polyacrylamide Gel Electrophoresis," *Federation Proceedings* **34** (6), p. 602, 1975.

DeFilippi, L. J. and Ballou, D., "Mechanism of Dithionite- and $H_2O_2$-Induced Bleaching of The Erythrocyte Formylhemin-Containing Protein," *Federation Proceedings* **35** (6), p. 1393, 1976.

DeFilippi, L. J. and Gibson, Q. H., "Problems in Defining the Hemoglobin T-State," *Federation Proceedings* **37** (6), p. 1672, 1978.

DeFilippi, L. J., "High Surface Area Immobilized Enzyme Electrode," *Federation Proceedings* **45** (6), p. 1945, 1986.

DeFilippi, L. J. and Lupton, F. S., "Bioremediation of Soluble Cr(VI) Using Anaerobic Sulfate Reducing Bacteria," *Proceedings of R&D92 National Research & Development Conference on the Control of Hazardous Materials, San Francisco CA*, pp. 138-141, February 4-6, 1992.

DeFilippi, L. J. and Lupton, F. S., "Bioremediation of Hexavalent Chromium Using Marine Sulfate Reducing Bacteria" (*Invited Lecture, NY/NJ Port Authority, no published abstract*), May 4-5, 1992.

DeFilippi, L. J. and Lupton, F. S., "Bioremediation of Chromium (VI) Contaminated Solid Residues Using Sulfate Reducing Bacteria" *Emerging Technologies in Hazardous Waste Management V*, American Chemical Society Division of Industrial and Engineering Chemistry Special Symposium, pp. 117-120, September 21-23, 1992, Atlanta, GA

DeFilippi, L. J., "Bioremediation of Chromium (VI) Contaminated Solid Residues Using Sulfate Reducing Bacteria" *Fourth Forum on Innovative Hazardous Waste Treatment Technologies: Domestic and International*, [U.S. Environmental Protection Agency, EPA/540/R-93/500], pp. 417-419, Nov. 17-19, 1992, [publication date February 1993] San Francisco, CA

DeFilippi, L. J., Sanyal, S. and Love, T. P., "Performance Improvement of a Fixed-Film Biological Reactor by the Use of Mixed Packing Media" *Emerging Technologies in Hazardous Waste Management V*, American Chemical Society Division of Industrial and Engineering Chemistry Special Symposium, pp. 130-132, September 27-29, 1993, Atlanta, GA.

DeFilippi, L. J., "Vapor Phase Biological Treatment Using Carbon Biomass Support" *Applied Bioremediation 93*, October 25-26, 1993, Fairfield, NJ.

DeFilippi, L. J., Koch, M. B., Voellinger, C. M., Winstead, D. R. and Lupton, F. L. "A Biological Air Treatment System Based Upon The Use of a Structured Biomass Support" *IGT Symposium on Gas, Oil and Environmental Biotechnology*, November 29 - December 1, 1993, Colorado Springs, CO.

Lupton, F.S., Sheridan, W.G. and DeFilippi L.J., "Combined Anaerobic In-Situ/Aerobic Ex-Situ Bioremediation of Chlorinated Ethenes Using an Immobilized Cell Bioreactor" (*Presented as a poster session at the U.S. EPA sponsored Fifth Forum on Innovative Hazardous Waste Treatment Technologies: Domestic and International*), pg. 151, May 3 to May 5, 1994, The Congress Hotel Chicago, Illinois.

## INVITED SPEAKER & RECENT PRESENTATIONS

DeFilippi, L. J., "Use of chemical modification, and application of physical chemistry and separations science principals, for the improvement of immobilized enzyme biocatalytic productivity", Gordon Conference, July 2004, Vermont

DeFilippi, L. J., "Chemical modification, physical chemistry, biotransformation and separations science principals combine for the improvement of immobilized enzyme biocatalytic productivity", University of Iowa 14th Annual Center for Biocatalysis and Bioprocessing Conference on Pharmaceutical and Industrial Biotechnology, October 2004, Iowa City, Iowa

DeFilippi, L. J., "Thoughts on International Trends (China) and Emerging Water Issues" Invited speaker, Environmental Practice Specialty, American Society of Safety Engineers ASSE Headquarters, 1800 Oakton, Des Plaines, IL, USA. April 13, 2007

DeFilippi, L. J., "How efficient is my enzymatic process?  A little help choosing the right standard curve using error analysis", Gordon Conference, July 2008, Rhode Island

DeFilippi, L. J., "Physical chemistry and separations principles for [bio-catalyzed (enzymatic) process] yield improvement", 9th International Symposium on Biocatalysis and Biotransformation, Berne, Switzerland, 5-9 July 2009

## BOOK CHAPTERS AND BOOK

DeFilippi, L. J., "Bioremediation of Hexavalent Chromium in Water, Soil and Slag Using Sulfate Reducing Bacteria" in D. L. Wise and D. J. Trantolo, eds., *Remediation of Hazardous Waste Contaminated Soils*, Marcel Dekker, New York, pp. 437-457, 1994.

DeFilippi, L. J. and Lupton, F. S., "Introduction to Microbiological Degradation of Aqueous Waste and Its Application using a Fixed-Film Reactor" in G. A. Lewandowski and L. J.

DeFilippi, eds., *Biological Treatment of Hazardous Wastes*, Wiley Interscience (John Wiley and Sons), pp. 35-68, 1998.

Lewandowski, G. A. and DeFilippi, L. J., eds., *Biological Treatment of Hazardous Wastes*, Wiley Interscience (John Wiley and Sons), 1998.

DeFilippi, L. J., "Sulfate Reducing Bacteria and Other Biological Agents for Bioremediation of Hexavalent Chromium and Other Heavy Metals" in Wise, D.L., Trantolo, D. J. and Cichon, E. J. Inyang, H.I., and U. Stottmeister, eds., *Bioremediation of Contaminated Soils,* Environmental Science and Pollution Series, Marcel Dekker, New York, pp. 177-208, 2000.

## PATENTS

DeFilippi, L. J., "Process for Preparing Immobilized Enzymes", U.S. Patent 4,229,536 (1980)

DeFilippi, L. J., "Magnetic Support Matrix for Enzyme Immobilization", U.S. Patent 4,343,901 (1982)

DeFilippi, L. J., "Antimicrobial Fabrics", U.S. Patent 4,496,363 (1985)

Malloy, T. P. and DeFilippi, L. J., "Surface Modified Electrodes", U.S. Patent 4,581,336 (1986)

Calcaterra, L. T., DeFilippi, L. J., Childs M. E. and Latos, E. J., "Antimicrobial Fabrics Using Graft Copolymers", U.S. Patent 4,810,567 (1989)

Lupton, F. S., DeFilippi, L. J., and Goodman, J. R., "Bioremediation of Chromium (VI) Contaminated Aqueous Systems by Sulfate Reducing Bacteria", U.S. Patent 5,062,956 (1991)

Lupton, F. S., DeFilippi, L. J., and Goodman, J. R., "Bioremediation of Chromium (VI) Contaminated Solid Residues", U.S. Patent 5,155,042 (1992)

Sanyal, S., Love, T. P., and DeFilippi, L. J., "Process and Apparatus for Removal of Organic Pollutants from Waste Water", U.S. Patent 5,217,616 (1993)

DeFilippi, Louis J., Mashayekhi, Mansour, Hribik Walter F. and Lupton, Francis S., "Apparatus And Process For Removal of Pollutants from Waste Water", WO1993022245A1; CA 2133980 (1993) [partially duplicative: some claims are in common with US issued patent(s), some are not. Is included here for completeness]

DeFilippi, L. J., Lupton, F. S. and Mashayekhi, M., "Process for Biological Remediation of Vaporous Pollutants", U.S. Patent 5,413,714 (1994)

DeFilippi, L. J., Lupton, F. S. and Mashayekhi, M., "Apparatus for Biological Remediation of Vaporous Pollutants", U.S. Patent 5,503,738 (1996)

DeFilippi, L. J., "Support Containing Particulate Adsorbent and Microorganisms for Removal of Pollutants", U.S. Patent 5,580,770 (1996)

DeFilippi, L. J. and Lupton, F. S. "Biologically Active Support Containing Bound Adsorbent Particles and Microorganisms for Waste Stream Purification", U.S. Patent 6,395,522 (2002)

Laszlo, J. A., Compton, D. L., DeFilippi, L. J. and Grall, S, "Methods of Making Composition Comprising a UV-Absorbing Chromophore", U.S. Patent 7,572,610 (2009)

Laszlo, J. A., Compton, D. L., DeFilippi, L. J. and Grall, S, "Compositions Comprising a UV-Absorbing Chromophore", U.S. Patent 7,727,514 (2010)

DeFilippi, L. J., Grall, Steven, G., Kinney, James F., Laszlo, Joseph A., Compton, David L.; "Formulations with Feruloyl Glycerides and Methods of Preparation", U.S. Patent 7,744,856 (2010)

Laszlo, J. A., Compton, D. L., DeFilippi, L. J. and Grall, S, "Compositions Comprising a UV-Absorbing Chromophore", U.S. Patent 8,357,353 (2013)

See also:

http://www.google.com/search?tbm=bks&tbo=1&q=DeFilippi+LJ&btnG=

-and-

http://www.google.com/search?tbm=bks&tbo=1&q=DeFilippi+LJ&btnG=#pq=defilippi+lj&hl=en&sugexp=pfwl&ds=bo&cp=15&gs_id=f&xhr=t&q=DeFilippi+Louis&pf=p&sclient=psy-ab&tbo=1&tbm=bks&source=hp&pbx=1&oq=DeFilippi+Louis&aq=f&aqi=&aql=&gs_sm=&gs_upl=&bav=on.2,or.r_gc.r_pw.,cf.osb&fp=62d1a0e253722033&biw=1024&bih=605

**Select litigation, expert witness, patent infringement, deposition & trial experience and insurance claim investigations**
Louis DeFilippi, PhD, President and Member, Louis DeFilippi, LLC
Date of update:  21-Feb-13

| Approx. Date of event | Type? | Defendant | Attorney(s) or agent representing defendant | Plaintiff | Attorney(s) or agent representing plaintiff | Description |
|---|---|---|---|---|---|---|
| 1980's and 1990's | Technology evaluations | NA | Honeywell International, formerly Allied-Signal, various | NA | NA | At the request of various business units at AlliedSignal / Honeywell, I evaluated numerous patents during my tenure as a research scientist and project manager. |
| 21-Jul-01 | Deposition | Agri-Yeast | ??? | Metropolitan Water Reclamation District of Greater Chicago (MWRDGC) | James Zabel & James Murray | Witness, alleged wastewater pollution violation: Defendant (Agri-Yeast) was ex-client; gave deposition, at request of MWRDGC attorneys (plaintiff), relating to allegation that Agri-Yeast was inappropriately discharging high-strength wastewater. |
| 1-Nov-01 | Report & Consultation | Rose Packing | Mr. Eric E. Boyd, Seyfarth & Shaw | Illinois Emergency Management Agency / Illinois Attorney | Assistant Attorney General, Illinois??? | Consultant, OSHA & EPA potential violation: Performed calculations for defendant relating to anhydrous ammonia release to determine if EPA and OSHA reporting requirements were violated. |
| 16-Nov-04 | Report & Deposition | Gustafson | Mr. Stuart Brody of Sneckenberg Thompson and Brody; (312) 782-9320 | Coughlin | Gallagher & Hoversen | Expert Witness, alleged groundwater contamination: Supervised data collection for defendant and wrote detailed report outlining how alleged groundwater contamination at plaintiff residence was below state drinking water regulations likely due to action of microorganisms / enzymes.  Gave deposition on same. |
| 27-Apr-05 | Deposition & Trial preparation (settled day before trial) | Gustafson | Mr. Stuart Brody of Sneckenberg Thompson and Brody | Coughlin | Gallagher & Hoversen | Expert Witness, alleged groundwater contamination: Opposing attorney of above case (plaintiff) settled out of court due to strength of data, report and deposition. |

| Date | Type | Client | Attorney for Defendant | Company | Contact | Description |
|---|---|---|---|---|---|---|
| 28-Sep-07 | Verbal report, consultation, patent infringement | J. Walter, Inc. | | Chemfree Corp | Thomas Southard of McKenna, Long & Aldridge (202) 496-7259 | Consulted for plaintiff on alleged **biochemical and microbiological patent infringement** case relating to the use of microorganisms / enzymes to aid in the degreasing of machine parts. |
| 12-Mar-08 | Deposition | Wiltel, Arco, Mikgee Water Condition-ing, Inc. (Culligan), et al. | Mr. Lawrence F. Hartstein, "Attorney for Defendant Mikgee Water" et al. TNTC | Green | Robert Schultz of Schultz & Associates; 640 Cepi Drive; Suite A Chesterfield, MO 63005-1221; Tel: (636) 537-4645 | Expert Witness; Gave deposition on behalf of plaintiff on **alleged groundwater contamination** of drinking water with benzene and other petroleum components. Also performed calculations based upon EPA data on lack of degree of effectiveness for activated carbon to remove the above contaminants. |
| 10-Jan-09 | Deposition & trial | Wiltel, Arco, Mikgee Water Condition-ing, Inc. (Culligan), et al. | Mr. Lawrence F. Hartstein, "Attorney for Defendant Mikgee Water" et al. TNTC | Green | Robert Schultz of Schultz & Associates | Description above; settled out-of-court, two days before commencement of trial. |
| 23-Jul-09 | Report, deposition & trial | Oreck | Ms. Gayle Jenkins, Partner at Winston & Strawn LLP; 333 S. Grand Ave., Los Angeles, CA 90071. (213) 615-1863 | Dyson | Mr. Tom Monagan, III; Partner, Kirkland & Ellis, LLP; 200 East Randolph Dr.; Chicago, IL 60601-6207. | Consulted & Expert Witness for defendant concerning **alleged inflated product claims (microbiology, antimicrobials)**; wrote detailed technical critique / report; presented deposition; reviewed expert report involving function of bacteriostatic and bactericidal (i.e., anti-microbial) additives in vacuum cleaner components. Settled out of court on 10/16/2009, three days before commencement of trial. |

| Date | Type | Client | Contact | Party | Attorney/Contact | Description |
|---|---|---|---|---|---|---|
| 15-Sep-10 | Evaluation and Report | VP Warehousing, LLC | Mr. Howard Pikel of Pretzel & Stouffer One South Wacker Drive Suite 2500 Chicago, IL 60606 | Dawn Food Products, Inc. | Carrie Marie Raver, Attorney at Law Barnes & Thornburg 4600 One Summit Square Fort Wayne, Indiana 46802 | Consulted for defendant concerning alleged claims relating to the finding of a purported mold on French Crullers. Report presented an expert opinion on the many potential sources for what is purported to be mold on Crullers produced by Dawn Food Products Inc., and stored at VP Warehousing, Inc. |
| 11-Apr-11 | Affidavit followed by Evidentiary Hearing at United States District Court | Dynarex Corporation | Mr. René Hertsberg, Associate & William J Ryan at Scandaglia & Ryan, 55 E. Monroe St, Ste 3440, Chicago, IL 60613, (312) 580-2060 | Latex Allergen Reduction, LLC | Joseph T. Leone & Harry E. Van Camp, Two East Mifflin St., Ste 600, Madison WI, 53703-2865, (608) 255-8891 | Expert Witness for Defendant in biochemical patent infringement case involving protease enzymes and latex allergens; presented testimony at Evidentiary Hearing. Judge ruled DeFilippi's testimony "compelling". |
| 14-Jun-12 | Consultation, evaluation and report | Dr. Reddy's Laboratories | Louis Weinstein, Esq.; @ Budd Larner P.C., | | | Patent infringement consultation, "Fish Oil" DHA: 1) U.S. Patent 8,188,146; 2) Application 12,052598; 3) Application 11,361089; 4) Miraxin Article February 2001 |
| 14-Oct-12 | Consultation, evaluation and report | Helena Chemical (Mesquite NM facility) | Mr. Gary J. Van Luchene Keleher & McLeod, P.A. P.O. Box AA Albuquerque, New Mexico 87103 | Arturo Aribe et al. | Ms. Linda Thomas of THOMAS & WAN LLP 1710 Sunset Blvd; Houston, Texas 77005; 713.529.1177 | Consultant for Plaintiff on Toxic Tort Civil case involving alleged releases of toxic chemicals into the environment resulting in significant exposure of surrounding residents. [Note: settled out of court in favor of Plaintiff]. |

Louis DeFilippi

7/29/2013

| 18-Jul-13 | Consultation on technical aspects | Robert-shaw Controls Company | Unkn | Environment One Corporation | Unkn | **Consultant for Professional Analysis and Consulting, Inc. (ProAaCI)** in case involving alleged <u>corrosion of one or components in a pump control system.</u> This is an ongoing project. Issued short report postulating biological corrosion. |

**Related experience**

| Approx. Date of event | Type? | Defendant | Contact requesting inspection and / or report | Location of site | Attorney (s) representing client, if any | Description |
|---|---|---|---|---|---|---|
| 1-Mar-11 | Consultation on technical aspects insurance claim | NA | Julianna O'Connell, Liberty Mutual Fire Insurance Company c/o Registered Agent, Corp. Serv. Co. P.O. Box 95408, Hoffman Estates, IL 60195-5408 | INDIANA STADIUM AND CONVENTION BUILDING AUTHORITY | Mr. Gary Dankert, ICE Miller, LLP | Consulted with Packer Engineering, Naperville, IL, for described project concerning possible **chemical and biological aspects of rust and corrosion** in the domestic water piping systems, Lucas Oil Stadium **with the objective of future liability reduction**. |
| 28-Apr-11 | On site inspection, analysis and report, insurance claim | NA | Mr. Mike Czerniak Indiana Insurance 15 Vernon Court South Elgin, IL 60177 | DeMotte Wastewater Treatment Plant (WWTP), 13390 N 900 W DeMotte, IN 46310; 219-987-3831 | NA | **Insurance claim related to alleged poisoning of wastewater plant.** Client (Indiana Insurance) requested I determine the chain of events & evaluate the root causes of an alleged release of a glycol-water mix occurred at the Middle School under construction in DeMotte, Indiana, negatively impacting the WWTP; inspected plant and school, interviewed involved parties, provided suggestions / recommendations to prevent a repeat of the release and **reduce future liabilities**. |

| 21-Jul-11 | Analysis of problem and report, insurance claim | NA | Unkn | Mr. Dave Dunkin Consolidated Electronic Wire & Cable 11044 King Street Franklin Park, IL 60131 | NA | Developed opinion on <u>loss minimization for alleged mold growth</u> on wooden wire spools investigating and recommendation for product reclamation and recovery. Product was inspected, surfaces photographed, mold analyzed by third party, recommendations for recovery of product was generated, minimizing losses. |
|---|---|---|---|---|---|---|
| 12-Sep-11 | On site inspection, analysis and report, insurance claim | NA | Glatfelter Claims Management, Inc., | Coal City Fire Protection District (FPD) offices located at 35 S. DeWitt, Coal City, IL. | NA | <u>Insurance claim relating to water damage and molds.</u> At request of Glatfelter Claims Management, Inc., completed an on-site inspection of the Coal City Fire Protection District to address water and mold issues; returned with the results of the inspection, determination of single occurrence or multiple incidents; representative samples taken from the wall surfaces in various rooms (analyzed by third party), and photographic documentation of the scope of the problem; wrote report discussing findings and recommendations. |
| On-going for multiple clients | Regulatory compliance [OSHA, EPA, USDA, etc.] | NA | NA | NA | NA | <u>Voluntary audits for regulatory compliance</u> with a multitude of regulations including EPA SARA Title III (EPCRA), TSCA (esp. PCBs), RMP (<u>Risk Management Planning</u>)112r, OSHA PSM 1910.119, HACCP, and numerous other regulations.  Also, generation and use of <u>Root Cause Analysis of Extremely Hazardous Substance releases to prevent or reduce future liabilities.</u> |

## Other trial experience

**Jury Foreman in Felony Assault / Murder trial**, State of Illinois, Circuit Court of Cook County "Courtroom 302," (the busiest felony courthouse in the country) Judge Kenneth J. Wades presiding; May 18, 2007.

US006764661B1

(12) **United States Patent**
Girard

(10) Patent No.: **US 6,764,661 B1**
(45) Date of Patent: **Jul. 20, 2004**

(54) **DEVICE FOR PRODUCING AN AQUEOUS CHLORINE DIOXIDE SOLUTION**

(75) Inventor: **J. Blair Girard**, Newcastle, OK (US)

(73) Assignee: **Avantec Technologies, Inc.**, Columbus, OH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 693 days.

(21) Appl. No.: **09/605,689**

(22) Filed: **Jun. 27, 2000**

(51) Int. Cl.$^7$ .......................... **A61L 9/015**; C01B 11/24
(52) U.S. Cl. .......................... **422/305**; 422/120; 222/3; 252/187.21; 423/477
(58) Field of Search ................................ 422/120, 122, 422/305; 222/3; 426/408, 561; 99/467, 474, 485; 423/477; 252/187.21

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,022,262 A | 11/1935 | White | 87/5 |
| 2,071,091 A | 2/1937 | Taylor | 167/17 |
| 2,071,094 A | 2/1937 | Vincent | 167/17 |
| 2,482,891 A | 9/1949 | Aston | 252/187 |
| 3,591,515 A | 7/1971 | Lovely | 252/187 |
| 4,104,190 A | 8/1978 | Hartshorn | 252/187 |
| 4,200,610 A | 4/1980 | Swaine et al. | |
| 4,547,381 A | 10/1985 | Mason et al. | 426/316 |
| 4,585,482 A | 4/1986 | Tice et al. | 106/15.05 |
| 4,593,040 A | 6/1986 | Adam et al. | 514/395 |
| 4,689,169 A | 8/1987 | Mason et al. | 252/186.24 |
| 4,731,193 A | 3/1988 | Mason et al. | 252/95 |
| 4,975,277 A | 12/1990 | Janisiewicz et al. | 424/93 |
| 5,008,096 A | 4/1991 | Ringo | 423/477 |
| 5,091,107 A | 2/1992 | Hutchings | |
| 5,215,747 A | 6/1993 | Hairston et al. | 424/93 |
| 5,278,112 A | 1/1994 | Klatte | 502/62 |
| 5,314,852 A | 5/1994 | Klatte | 502/60 |
| 5,334,619 A | 8/1994 | Vaughn et al. | 514/675 |
| 5,387,207 A | 2/1995 | Dyer et al. | 604/369 |
| 5,567,405 A | 10/1996 | Klatte et al. | 423/477 |
| 5,703,948 A | 12/1997 | Yanovsky | 380/21 |
| 5,705,092 A | 1/1998 | Wellinghoff et al. | 252/187.21 |
| 5,707,546 A | 1/1998 | Pitochelli | 252/187.21 |
| 5,707,739 A | 1/1998 | Wellinghoff et al. | 428/403 |
| 5,777,850 A | 7/1998 | Jakob et al. | 361/736 |
| 5,851,374 A | 12/1998 | Cowley et al. | 205/471 |
| 5,853,689 A | 12/1998 | Klatte | 423/478 |
| 5,885,543 A | 3/1999 | Klatte | 423/477 |
| 5,895,638 A | 4/1999 | Tenney | 423/478 |
| 6,015,935 A | 1/2000 | LaVon et al. | 604/378 |
| 6,238,643 B1 | 5/2001 | Thangaraj et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 959238 | 12/1974 |
| EP | 0 360 794 B1 | 8/1994 |
| WO | WO 99/24356 | 5/1999 |

Primary Examiner—Robert J. Warden, Sr.
Assistant Examiner—Sean E. Conley
(74) Attorney, Agent, or Firm—Speckman Law Group

(57) **ABSTRACT**

A device for producing an aqueous chlorine dioxide solution when placed in water. The device includes a membrane shell that defines a compartment which includes one or more dry chemicals (e.g., a metal chlorite and an acid) capable of producing chlorine dioxide gas when exposed to water. Wick means extend into the compartment for absorbing water and transporting water into the compartment such that the chemical(s) in the compartment dissolve in the water and produce chlorine dioxide. In one embodiment, the membrane is formed of a material that allows the passage of gas (e.g., chlorine dioxide) but is impervious to liquid (e.g., water). In another embodiment, the wick means is a wick member which divides the compartment into first and second compartment sections. One chemical (metal chlorite, for example) is contained within the first compartment section and another chemical (acid, for example) is contained within or can easily be placed in the second compartment section. When the device is placed in water, water enters the device by way of the wick means and possibly the membrane shell. The chemicals dissolve in the water and react to produce chlorine dioxide gas. The chlorine dioxide gas then passes through the membrane shell and possibly the wick member into the surrounding water transforming the water into an aqueous chlorine dioxide solution. The solution can then be used, for example, as a disinfectant solution.

**57 Claims, 12 Drawing Sheets**



Case 0:13-cv-60136-DMM   Document 51-3   Entered on FLSD Docket 09/25/2013   Page 47 of 102



**FIGURE 1**

**FIGURE 2**

Case 0:13-cv-60136-DMM   Document 51-3   Entered on FLSD Docket 09/25/2013   Page 48 of 102



FIGURE 4



FIGURE 3

Case 0:13-cv-60136-DMM   Document 51-3   Entered on FLSD Docket 09/25/2013   Page 49 of 102



FIGURE 6

FIGURE 5

Case 0:13-cv-60136-DMM   Document 51-3   Entered on FLSD Docket 09/25/2013   Page 50 of 102



FIGURE 8

FIGURE 7



FIGURE 9          FIGURE 10



FIGURE 12

FIGURE 11



FIGURE 14

FIGURE 13

Case 0:13-cv-60136-DMM   Document 51-3   Entered on FLSD Docket 09/25/2013   Page 54 of 102



FIGURE 15

FIGURE 16

FIGURE 17

Case 0:13-cv-60136-DMM   Document 51-3   Entered on FLSD Docket 09/25/2013   Page 55 of 102



**FIGURE 18**                    **FIGURE 19**

Case 0:13-cv-60136-DMM   Document 51-3   Entered on FLSD Docket 09/25/2013   Page 56 of 102



FIGURE 21

FIGURE 20



FIGURE 23

FIGURE 22



**FIGURE 24**

US 6,764,661 B1

1

# DEVICE FOR PRODUCING AN AQUEOUS CHLORINE DIOXIDE SOLUTION

## BACKGROUND OF THE INVENTION

This invention relates generally to apparatus and methods for producing aqueous chlorine dioxide solutions, and particularly to such apparatus and methods that utilize dry chemicals that react to form chlorine dioxide when exposed to water.

Chlorine dioxide is an excellent disinfectant and oxidizer with bleaching, deodorizing, bactericidal, viricidal, algicidal and fungicidal properties. It is frequently used to control microorganisms on or around foods because it destroys the microorganisms without forming byproducts that pose a significant adverse risk to human health, e.g., chloramines and chlorinated organic compounds. Chlorine dioxide is an effective antimicrobial agent at a concentration as low as 0.1 ppm and over a wide pH range. It is thought to penetrate cell walls and cell membranes and react with vital amino acids in the cytoplasm of the cell to kill the organism.

Unfortunately, chlorine dioxide is not stable during storage and can be explosive at high concentrations. As a result, chlorine dioxide gas is not produced and shipped under pressure. It must generally be generated on site using conventional chlorine dioxide generators or other means of generation. Conventional chlorine dioxide generation can be carried out in an efficient manner in connection with large-scale operations such as those in pulp and paper or water treatment facilities. In other applications, however, generating chlorine dioxide on site is not a good option. Conventional on-site chlorine dioxide generation can be costly, cumbersome and difficult because of the need for a generator and the need to handle the generator and the chemicals associated with the generation process.

Chlorine dioxide can also be generated by combining chlorite anions and acid in an aqueous solution. Typically, an acid is added to a solution containing in the range of from about 0.01 to about 32 percent by weight sodium chlorite and having a pH in the range of from about 8 to about 13. The acid can be any acid capable of lowering the pH of the solution to a level below about 7. For example, when approximately 10 grams of citric acid powder are added to an aqueous solution containing approximately 3.35% by weight sodium chlorite, the pH of the solution is lowered to about 2.9 and a solution containing approximately 7% by weight chlorine dioxide is formed.

A solution of a metal chlorite and water wherein the pH of the solution is maintained at 8 or above is sometimes referred to as a stabilized chlorine dioxide solution. Unfortunately, stabilize chlorine dioxide solutions are of limited use if they are needed at remote locations because of the difficulty and expense associated with handling and shipping the solutions. Also, in order to activate a "stabilized" chlorine dioxide solution, the pH of the solution must be lowered to below 5, typically to a range of from about 2 to about 3. Although lowering the pH of the solution to such a level can be done on site, it is not typically a good alternative because of the danger associated with handling acids manually (e.g., the danger associated with inadvertent skin contact and inhalation of acid vapors).

In order to avoid the difficulty of using conventional chlorine dioxide generators, the expense associated with handling and shipping stabilized chlorine dioxide solutions and related precursor solutions and the dangers associated with activating chlorine dioxide solutions, dry compositions

2

containing chemicals (e.g., sodium chlorite and acid) that react to form chlorine dioxide when placed in water have been developed. The compositions can be easily shipped to remote locations in dry form. The necessary water can be merely added on site. For example, in an application wherein a disinfectant solution is needed to clean surfaces, a dry composition containing a metal chlorite and an acid can be mixed with water on site which causes the components to react and produce an aqueous chlorine dioxide solution. The solution is then used to disinfect the surfaces. The aqueous chlorine dioxide solution is produced (chlorite anion is converted to chlorine dioxide) according to the following equation:

$$5ClO_2^- + 5H^+ \rightarrow 4ClO_2 + HCl + 2H_2O$$

Dry compositions for generating chlorine dioxide solutions are known in the art. For example, U.S. Pat. No. 2,022,262, issued to White on Nov. 26, 1935, discloses stable stain-removing compositions made from a dry mixture of water-soluble alkaline chlorite salt, an oxalate and an acid. U.S. Pat. No. 2,071,091, issued to Taylor on Feb. 16, 1937, discloses the use of chlorous acid and chlorites to kill fungi and bacterial organisms by exposing the organisms to the compounds at a pH of less than about 7. The patent also discloses using dry mixtures of chlorites and acids to produce stable aqueous solutions useful as bleaching agents. U.S. Pat. No. 2,482,891, issued to Aston on Sep. 27, 1949, discloses stable, solid, substantially anhydrous compositions comprising alkaline chlorite salts and organic acid anhydrides which release chlorine dioxide when contacted with water.

Canadian Patent No. 959,238, issued to Callerame on Dec. 17, 1974, discloses using two water-soluble envelopes, one containing sodium chlorite and one containing an acid, to generate chlorine dioxide. The envelopes are placed in water and the sodium chlorite and acid dissolve in the water and react to produce a chlorine dioxide solution. U.S. Pat. No. 2,071,094, issued to Vincent on Feb. 16, 1937, discloses deodorizing compositions in the form of dry briquettes formed of a mixture of soluble chlorite, an acidifying agent, and a filler of relatively low solubility. Chlorine dioxide is generated when the briquettes contact water.

U.S. Pat. No. 4,585,482, issued to Tice et al. on Apr. 29, 1986, discloses a long-acting biocidal composition comprising a microencapsulated mixture of chlorite and acid that when added to water releases chlorine dioxide. The primary purpose of the microencapsulation is to provide for hard particles that will be free flowing when handled. The microencapsulated composition also protects against water loss from the interior of the microcapsule. The microcapsules produce chlorine dioxide when immersed in water. Unfortunately, the microcapsules release chlorine dioxide relatively slowly and are therefore not suitable for applications that require the preparation of chlorine dioxide on a relatively fast basis.

PCT Application PCT/US98/22564 (WO 99/24356), published on May 20, 1999, discloses a method and device for producing chlorine dioxide solutions wherein sodium chlorite and an acid are mixed and enclosed in a semi-permeable membrane device. When the device is placed in water, water penetrates the membrane. The acid and sodium chlorite dissolve in the water and react to produce chlorine dioxide. The chlorine dioxide exits the device through the membrane into the water in which the device is immersed producing a chlorine dioxide solution that can be used as an antimicrobial solution or for other purposes. The primary disadvantage of the disclosed device and method is that ambi-

US 6,764,661 B1

3

ent moisture can penetrate the semi-permeable membrane and initiate the reaction prematurely.

In general, the prior art devices and methods using membranes are susceptible to premature activation by water or water vapor and therefore have a reduced shelf life unless sufficient steps are taken to protect the devices from exposure to ambient moisture or water. Such devices and methods are typically slow to interact with water and produce the desired chlorine dioxide. Also, in order to comply with U.S. Department of Transportation and other regulations, many prior art devices require that special and sometimes burdensome handling and shipping procedures be utilized in connection with the devices. For example, if sodium chlorite and acid are packaged together, certain restrictions may apply.

As a result, there is a need for a device for producing an aqueous chlorine dioxide solution that has an extended shelf life compared to prior art devices, that is not susceptible to activation by ambient moisture, that forms a chlorine dioxide solution much more quickly than prior art devices and that can be assembled and packaged in ways that avoid stringent handling and shipping regulations.

SUMMARY OF THE INVENTION

In accordance with the invention, a device for producing an aqueous chlorine dioxide solution when exposed to water is provided. The device comprises a membrane shell defining a compartment which includes one or more dry chemical components capable of producing chlorine dioxide gas when exposed to water. Wick means are connected to the membrane shell and extend into the compartment for absorbing water and transporting water into the compartment whereby when the device is exposed to water the wick member absorbs water and transports water into the compartment, the chemical component(s) dissolve in the water and produce chlorine dioxide gas in the compartment, and chlorine dioxide gas exits the compartment through the membrane shell.

In a preferred embodiment, the compartment of the device includes a metal chlorite component and an acid component. In use, for example, the device is submersed in a container of water. The wick means quickly absorbs water and transports the water into the compartment. Metal chlorite and acid in the compartment then dissolve in the water and react to produce chlorine dioxide gas in the compartment. The chlorine dioxide gas passes through the membrane shell and transforms the water in the container into a chlorine dioxide solution. The solution can be used, for example, to disinfect surfaces or for a variety of other purposes as known in the art.

In one embodiment, the membrane shell is substantially impervious to liquid (e.g., water) but permeable to gas (e.g., chlorine dioxide gas). In another embodiment, the membrane shell is permeable to both liquid (e.g., water) and gas (e.g., chlorine dioxide gas).

In another embodiment, the wick means is a wick member having a first end that extends into the compartment and an opposing second end that extends beyond the outer edge of the membrane shell. In yet another embodiment, the wick means is a wick member that divides the compartment into first and second compartment sections. For example, the first compartment section can contain exclusively the metal chlorite component and the second compartment section can contain exclusively the acid component. This helps prevent the metal chlorite component and acid component from prematurely reacting. For example, in the event that a small

4

amount of moisture accumulates in the device, the wick member will prevent a reaction that might otherwise occur. In another embodiment, the wick means is a wick member that divides the compartment into a plurality of compartment sections. For example, the metal chlorite component can be isolated in one compartment section, the acid component can be isolated in a second compartment section, and a surfactant or some other additive can be isolated in a third compartment section. In another embodiment, the wick means comprises at least two wick members, the wick members dividing the compartment into at least two compartment sections.

The inventive device is very useful for relatively small applications, for example where expensive chlorine dioxide generation equipment is not economically feasible.

An important advantage of the inventive device is that it can be modified to meet applicable shipping and handling regulations. For example, in one embodiment, the device is packaged to include a metal chlorite component together with any additives employed for the particular application. The compartment of the device includes a sealable opening therein for allowing the acid component to be placed in the compartment at the point of use (e.g., just prior to submersing the device to water). The acid component is separately packaged with the device; for example, it can be in tablet form. Prior to placing the device in water, the user merely inserts the acid in the device and seals the opening. By packaging the acid component separately, inadvertent premature exposure of the device to water (even a substantial amount of water) will not cause the chemicals to react. As a result, less stringent regulations regarding shipping and handling the device may apply.

If necessary or desirable for the end-use application, a weight can be attached to one of the membrane shell and the wick means (e.g., placed into the compartment) or otherwise incorporated into the device (e.g., formed as part of the wick member) to ensure that the device is immersed when it is placed in a body of water. Although it is not critical to do so, the device can also be packaged in a water-resistant envelope (e.g., a foil pouch) in order to minimize the risk of the device being inadvertently exposed to water prior to use. Also, for particular applications, the membrane shell can include a plurality of small openings for facilitating the passage of liquid (e.g., water) into and out of the device and decreasing the time required for the chlorine dioxide solution to be produced.

It is, therefore, an object of the present invention to provide a device that effectively produces an aqueous chlorine dioxide solution when exposed to water but has a stable shelf-life prior to exposure to water.

It is also an object of the present invention to provide such a device that is not susceptible to activation by ambient moisture.

It is a further object of the present invention to provide such a device that is less costly to produce and manufacture than other devices for producing aqueous chlorine dioxide solutions presently on the market.

It is yet another object of the present invention to provide a device that produces an aqueous chlorine dioxide solution in a relatively short amount of time when compared to prior art devices.

Still another object of the invention is to provide such a device that can be modified to meet applicable shipping and handling regulations.

Additional objects, features and advantages of the present invention will be readily apparent to those skilled in the art

US 6,764,661 B1

5

upon a reading of the detailed description of preferred embodiments of the invention which follows when taken in conjunction with the accompanying drawings.

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWING

FIG. 1 is a front perspective view of one embodiment of the inventive device;

FIG. 2 is a cross-sectional view taken along line 2—2 of FIG. 1;

FIG. 3 is a cross-sectional view taken along line 3—3 of FIG. 1;

FIG. 4 is a front perspective view of another embodiment of the inventive device;

FIG. 5 is a front elevational view of the device shown by FIG. 4;

FIG. 6 is a cross-sectional view taken along line 6—6 of FIG. 4, or line 6—6 of FIG. 5;

FIG. 7 is a front elevational view of the device shown by FIGS. 4–6 as modified to include a plurality of openings in the outer membrane shell;

FIG. 8 is a front elevational view of yet another embodiment of the inventive device;

FIG. 9 is a cross-sectional view taken along line 9—9 of FIG. 8;

FIG. 10 is a cross-sectional view similar to the view shown by FIG. 9 but illustrating yet another embodiment of the inventive device;

FIG. 11 is a front perspective view of yet another embodiment of the inventive device;

FIG. 12 is a cross-sectional view taken along line 12—12 of FIG. 11;

FIG. 13 is a front perspective view of yet another embodiment of the inventive device;

FIG. 14 is a cross-sectional view taken along line 14—14 of FIG. 13;

FIG. 15 is a front elevation view of a component of the device shown by FIGS. 13 and 14;

FIG. 16 is a front elevation view of a component of yet another embodiment of the inventive device;

FIG. 17 is a cross-sectional view similar to the view shown by FIG. 14 except it shows the embodiment of the inventive device to which FIG. 16 relates;

FIG. 18 is a view similar to the view shown by FIG. 14 except it shows another embodiment of the inventive device;

FIG. 19 is a view similar to the view shown by FIG. 17 except is shows yet another embodiment of the inventive device;

FIG. 20 is a front elevation view of yet another embodiment of the inventive device;

FIG. 21 is a cross-sectional view taken along line 21—21 of FIG. 18;

FIG. 22 is a rear elevation view of the embodiment of the inventive device shown by FIGS. 20 and 21;

FIG. 23 is a cross-sectional view taken along line 23—23 of FIG. 22; and

FIG. 24 is a front elevation view of a container of water having the inventive device submersed therein.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS OF THE INVENTION

Referring now to the drawings and particularly to FIGS. 1–3, a first embodiment of the inventive device for produc-

6

ing an aqueous chlorine dioxide solution when the device is exposed to water is illustrated and generally designated by the numeral 20. As used herein, the term aqueous chlorine dioxide solution shall encompass both solutions containing chlorine dioxide and solutions containing acidified chlorite.

The device 20 comprises a membrane shell 22 and a wick member 24. The membrane shell defines a compartment 30 which includes one or more dry chemical components capable of producing chlorine dioxide gas when the device is exposed to water (i.e., contacted with sufficient water to cause the device to produce chlorine dioxide in its intended manner). The device is preferably exposed to water by placing or submersing it in a container of water.

The dry chemical components capable of producing chlorine dioxide gas upon exposure to water are preferably a metal chlorite component 32 and an acid component 34. Additives such as a catalyst for enhancing the reaction of the metal chlorite and acid, generally designated by the reference numeral 36, can also be included in the compartment 30. As used herein and in the intended claims, the term "dry chemical components" means chemical components in stable, solid, substantially anhydrous form.

The wick member 24 is connected to the membrane shell 22 and extends into the compartment 30. The wick member 24 functions as a wick in that it rapidly absorbs water from outside the device and transports the absorbed water into the compartment 30. For example, metal chlorite, acid and/or other chemicals in the compartment 30 dissolve in the absorbed water and react to produce chlorine dioxide gas. The chlorine dioxide gas efficiently exits the compartment 30 through the membrane shell 22 and possibly, to some extent, through the wick member 24.

The wick member 24 can be connected to the membrane shell 22 by being directly or indirectly fastened to a portion of the shell or by being merely inserted into the compartment 30. Due to a difference in the pressure outside the device 20 and the pressure in the compartment 30, the wick member 24 transports water into the compartment at a much faster rate than it allows water and/or solution to escape the device.

As shown by FIGS. 1–3, the membrane shell 22 is defined by two square panels 22A and 22B sealed together such that the compartment 30 is formed between the panels. The panels 22A and 22B are approximately the same size and form an outer edge 40 of the membrane shell 22. The outer edge 40 of the membrane shell 22 includes a top edge 42, bottom edge 44, side edge 46 and side edge 48. The panels 22A and 22B are sealed together along a line 50 which extends around the periphery of the panels just inside of the outer edge 40 of the membrane shell 22. Specifically, the seal extends along the line 50A adjacent to the top edge 42, along the line 50B adjacent to the side edge 46, along the line 50C adjacent to the bottom edge 44, and along the line 50D adjacent to the side edge 48 of the outer edge 40 of the membrane shell 22.

The panels 22A and 22B can be sealed together by a variety of means including stitching, heating and gluing. Preferably, the panels 22A and 22B are sealed together by stitching.

As shown, the wick member 24 is a rectangular sheet positioned between the panels 22A and 22B. The wick member 24 includes a bottom end 60 positioned in the compartment 30, an opposing top end 62 extending beyond the outer edge 40 of the membrane shell 22, and a first side 64 and second side 66 connecting the top and bottom ends and completing an outer periphery 68 of the wick member. Preferably at least 15% of the outer periphery of the wick

US 6,764,661 B1

7

member 24 extends beyond the outer periphery of the membrane shell 22.

In the embodiment shown by FIGS. 1–3, the wick member 24 is sealed between the panels 22A and 22B only along the line 50A adjacent the top end 62 of the wick member. This allows the various chemicals in the compartment 30 to commingle.

A weight 70 is inserted in the compartment 30 to ensure that the device sinks or is otherwise immersed when placed in a body of water. The weight can be attached to the device by other means as well; e.g., it can be attached to or formed as part of the membrane shell 22 and/or wick member 24. The size and shape of the weight 70 can vary depending on the size of the device 20 in general, the intended application and manufacturing and packaging concerns. The weight 70 can be formed of a variety of materials. It is important for the particular material used, however, to be inert with respect to the chemicals in the device. Preferably, the weight is formed of stainless steel.

In order to reduce the chance of a premature exposure of the metal chlorite component 32, acid component 34, additive(s) 36 and/or other chemicals in the compartment 30 to water, the membrane shell 22 and the wick member 24 can optionally be enclosed and sealed in a water-resistant package 74. The package 74 can be formed of a variety of materials. Preferably, the package 74 is a foil-laminated pouch.

The shape and size of the panels 22A and 22B and the corresponding compartment 30 can vary depending primarily on the amount of chemicals needed for the particular application (e.g., the amount of metal chlorite and acid needed for the desired amount and concentration of chlorine dioxide solution). Methods for calculating the amount of metal chlorite and acid needed to produce a given volume and concentration of chlorine dioxide solution are known to those skilled in the art. Additional factors affecting the size and shape of the panels 22A and 22B and the membrane shell 22 in general include the type of material used to form the panels, the intended application, packaging concerns and material compatibility. The panels 22A and 22B are preferably square or rectangular in shape in order to facilitate the step of fastening (e.g., stitching) the panels together.

The panels 22A and 22B and hence the membrane shell 22 are formed of a material and put together such that they function as a semi-permeable membrane. The membrane shell 22 (including the panels 22A and 22B) must be permeable to chlorine dioxide gas. Preferably, the membrane shell 22 is substantially impervious (most preferably completely impervious) to liquid (e.g., water). In this embodiment, water enters the device and solution exits the device only by way of the wick member 24. Chlorine dioxide gas generated by, for example, the reaction of chlorite ions and acid in the compartment 30 exits the device through the membrane shell 22 (i.e., the panels 22A and 22B) and possibly, to some extent, the wick member 24. The aqueous solution formed in the device is confined, for the most part, to the device. By preventing the aqueous solution formed and associated dissolved or solid chemicals from escaping the device through the membrane shell 22, the reaction is more complete and can be more easily controlled. Such a setup is desirable in applications wherein the amount of chlorine dioxide generated is critical and needs to be precisely controlled. For example, small amounts of water inadvertently encountered by the device will not enter the compartment 30 and cause premature reaction of the chemicals therein (a small amount of water is merely absorbed and held by the wick member 24).

8

In another embodiment, the membrane shell 22 is permeable to liquid (e.g., water and chlorine dioxide solution) and gas (e.g., chlorine dioxide gas). In this embodiment, water can enter the device and aqueous solution that is formed in the device can exit the device by way of the membrane shell 22. This decreases the amount of time required for the desired chlorine dioxide solution to be generated and is desirable in applications wherein the level of activation is low and immediate use of the solution is desired.

The permeability of the panels 22A and 22B with respect to gas and/or water can be the same or not the same depending on the desired function of the device. For example, the panel 22A can allow water to pass into one side of the compartment 30 while the panel 22B does not allow water to pass into the compartment 30.

The selected permeability of the panels 22A and 22B and hence the membrane shell 22 with respect to gas (e.g., chlorine dioxide) and liquid (e.g., water) is initially a function of the material composite and can be modified by mechanically, chemically and/or structurally altering the material. For example, as described below, a plurality of small openings can be formed in one or both of the panels 22A and 22B to facilitate the passage of liquid into and out of the compartment 30. Also, one or both of the panels 22A and 22B can be coated with various materials to alter the permeability thereof.

The membrane shell 22 (including the panels 22A and 22B) can be made of any membrane material that allows the membrane shell to function as described above; e.g., that allows the membrane shell to be substantially impervious to water but permeable to chlorine dioxide gas. For example, the membrane shell 22 (including the panels 22A and 22B) can be made from fibers. The fibers can be hydrophilic, hydrophobic or any combination thereof The fibers can be naturally occurring and/or synthetic, and can be woven or non-woven. Additionally, the fibers may be coated or non-coated. For example, the fibers can be coated to seal the fibers to each other or to other materials such as in a laminate composite.

Suitable synthetic fibers for the membrane shell 22 include polyvinyl chloride, polyvinyl fluoride, polytetrafluoroethylene, polyvinylidene chloride, polyacrylics such as Orlon® polyvinyl acetate, polyethylvinyl acetate, non-soluble or soluble polyvinyl alcohol, polyolefins such as polyethylene and polypropylene, polyamides such as nylon, polyesters such as Dacron® or Kodel® polyurethanes, polystyrenes and the like.

Suitable water impervious materials for forming the membrane shell 22 include microporous non-woven hydrophobic polymer sheet materials including non-woven polyethylene (e.g., Tyvek® brand materials sold by E.I. Du Pont de Nemours & Co.), microporous non-woven polypropylene materials, expanded polytetrafluoroethylene (e.g., Gore-Tex® brand sold by W.L. Gore), and kraft paper (e.g., X-Crepe-N Grade 4502 sold by Oliver Products Co.). Suitable water-permeable membrane materials include gelatin, polyvinyl alcohol, cellulose, and cellulose derivatives such as hydroxypropyl methyl cellulose. Other water permeable and water impermeable membrane materials suitable for use in forming the membrane shell 22 (including the panels 22A and 22B) are known to those skilled in the art and are included within the scope of the present invention.

The panels 22A and 22B and hence the membrane shell 22 in general are preferably formed of a polyolefin material such as polyethylene and polypropylene. Most preferably, the panels 22A and 22B and hence the membrane shell 22 in general are formed of a microporous non-woven polyethylene.

US 6,764,661 B1

9

The shape and size of the wick member 24 can vary depending on the size of the compartment 30, the water absorption rate desired, the type of material used to form the wick member, the intended application, packaging concerns and material compatibility. In the embodiment shown in FIGS. 1–3, the wick member 24 is almost as wide and extends almost to the bottom of the compartment 30. Approximately $\frac{1}{2}^{th}$ of the length of the wick member 24 extends beyond the outer edge 40 of the membrane shell 22. These features allow the wick member 24 to absorb and transport a relatively large amount of water on a relatively rapid basis. In order to increase the surface area of the wick member 24 to be exposed to the water even further, for example, the bottom end 60 of the wick member can also extend beyond the outer edge 40 of the membrane shell 22. As long as the wick member 24 is not sealed to the panels 22A and 22B around all of its edges, commingling of the chemicals will occur, at least to some extent.

In an application where a relatively slow release of chlorine dioxide is desired, the wick member 24 can be formed of a material that has a relatively slower wicking rate such that water is transported more slowly into the compartment 30. Alternatively, the surface area of the wick member 24 extending outside of the device can be decreased so as to slow down the water absorption rate. For example, the wick member can be a small cylindrical rope extending into the compartment 30.

The wick member 24 can be made out of a large variety of materials. For example, in the preferred embodiment, the wick member can be made of virtually any material capable of quickly absorbing water and transporting the absorbed water into the device. For example, the material used to form the wick member 24 may be made of synthetic fibers, naturally occurring fiber(s) (both modified and unmodified) or both. The fibers can include hydrophilic fibers, hydrophobic fibers or a combination of hydrophilic and hydrophobic fibers.

Examples of suitable natural fibers for the wick member 24 include cotton, Esparto grass, bagasse, hemp, flax, silk, wool, wood pulp, chemically modified wood pulp, jute, rayon, ethyl cellulose, and cellulose acetate. Suitable synthetic fibers can be made from polyvinyl chloride, polyvinyl fluoride, polytetrafluoroethylene, polyvinylidene chloride, polyacrylics such as Orlon®, polyvinyl acetate, polyethylvinyl acetate, non-soluble and soluble polyvinyl alcohols, polyolefins such as polyethylene and polypropylene, polyamides such as nylon, polyesters such as Dacron® and Kodel®, polyurethanes, polystyrenes and the like. In order to function as a wick, certain synthetic fibers may require some modification (e.g., formed into laminates, etc.). The desired wicking action can result form absorption of water, capillary action and/or other mechanisms.

The wick member 24 is preferably formed of one or more natural fibers. More preferably, the wick member 24 is selected from the group consisting of cotton and wood pulp. Most preferably, the wick member is formed of non-synthetic fibers of cotton.

As known to those skilled in the art, the specific type of metal chlorite component, acid component and additive(s) employed in connection with the inventive device 20 will vary depending on numerous factors including the intended application for the device, packaging concerns and material compatibility. The reaction of a metal chlorite with an acid to generate chlorine dioxide is well known.

As used herein, the term "metal chlorite component" means a compound which is a metal chlorite or which forms

10

a metal chlorite when exposed to water and/or the acid component. The metal chlorite component generally comprises a metal chlorite selected from the group consisting of alkali metal chlorites, alkaline earth metal chlorites and mixtures thereof. Preferably, the metal chlorite component is selected from the group consisting of sodium chlorite, potassium chlorite, barium chlorite, calcium chlorite, and magnesium chlorite, more preferably from the group consisting of sodium chlorite, calcium chlorite, potassium chlorite and mixtures thereof. Most preferably, the metal chlorite component is sodium chlorite ($NaClO_2$), particularly dry technical grade sodium chlorite (containing about 80% by weight sodium chlorite and 20% by weight sodium chloride).

As used herein, the term "acid component" means a compound which is acidic or which produces an acidic environment in the presence of water sufficient to activate or react with the metal chlorite component such that chlorine dioxide is produced. For example, the acid component can include an organic acid, a mineral acid or mixtures thereof. It is preferably a dry solid hydrophilic compound which does not substantially react with the metal chlorite until the chemicals are dissolved in water. Examples of organic acids that can be used include citric acid, boric acid, lactic acid, tartaric acid, maleic acid, malic acid, glutaric acid, adipic acid, acetic acid, formic acid, sulfamic acid and mixtures thereof. Examples of mineral acids that can be used include sulfuric acid, hydrochloric acid, phosphoric acid and mixtures thereof. Preferred mineral acids are those that are of food grade quality such as phosphoric anhydride and sulfuric anhydride. Alternatively, an acid precursor that produces an acid when exposed to water can be used. Examples of suitable acid precursors include water soluble organic acid anhydrides such as maleic anhydride, and water soluble acid salts such as calcium chloride, magnesium chloride, magnesium nitrate, lithium chloride, magnesium sulfate, aluminum sulfate, sodium acid sulfate, sodium dihydrogen phosphate, potassium acid sulfate, potassium dihydrogen phosphate, and mixtures thereof. Additional water-soluble acid forming precursors are known to those skilled in the art.

Of the organic acids, citric acid is most preferred. Of the mineral acids, phosphoric acid is most preferred. Preferably, the acid component is an organic acid. Most preferably, due to its food grade status, cost and low toxicity, the acid component is food grade, preferably citric acid.

As understood by those skilled in the art, the amounts of metal chlorite and acid that should be placed in the component will vary depending on the size of the compartment 30, the concentration of chlorine dioxide in the solution desired and the desired pH of final solution. Preferably, the ratio of acid to metal chlorite in the compartment 30 is in the range of from about 5:1 to about 1:100, more preferably in the range of from about 1:1 to about 1:10.

The types and amounts of additive or additives included in the compartment 30 will also vary depending on the intended application, the types of metal chlorite and acid used, packaging concerns and material compatibility. Examples of additives that can be employed include adhesives, thickeners, penetrating agents, stabilizers, surfactants, binders, organic solids, inorganic solids, catalysts and other components that enhance the ability of the device to produce chlorine dioxide when exposed to water.

A catalytic amount of a catalyst selected from the group consisting of a transition metal, a transition metal oxide and mixtures thereof can be included in the compartment 30 to speed up the reaction. The use of such catalysts is disclosed

US 6,764,661 B1

11

by U.S. Pat. No. 5,008,096, issued to Ringo on Apr. 16, 1991, which is incorporated by reference herein.

The metal chlorite component, acid component and any additive(s) utilized in connection with the device 20 can be in any physical form which can be contained within the device in dry form; e.g., powders, granules, pellets, tablets, agglomerates and the like. Preferably, the components are in powder form because powders tend to dissolve in water and react more quickly when compared to large particles such as pellets or agglomerates.

The metal chlorite and acid can each be impregnated on inert carriers that are chemically compatible with the components, e.g., zeolite, kaolin, mica, bentonite, sepiolite, diatomaceous earth, and synthetic silica. Other such carriers are known to those skilled in the art. For example, a carrier can be useful to control the release of the chlorite and acid into solution and thus control the reaction even further. Such a carrier is preferably insoluble in water.

The types of metal chlorites, acids and additives that can be employed and well as the amounts of components, reaction conditions and other involved parameters are described in Canadian Patent No. 959238 and PCT Application No. PCT/US98/22564, which are incorporated by reference herein.

Referring now to FIGS. 4–6, a second embodiment of the inventive device 20 will be described. This embodiment of the device 20 is the same as the embodiment shown by FIGS. 1–3 and described above except for the size of the wick member 24 and the way that the wick member is fastened to the membrane shell 22.

In the embodiment shown by FIGS. 4–6, the wick member 24 is of a size such that the entire outer periphery 68, including the bottom end 60, top end 62, first side 64 and second side 66, of the wick member extends beyond the entire outer edge 40 of the membrane shell 22. The wick member 24 is sealed to the panels 22A and 22B of the membrane shell 22 along the entire line 50, that is continuously along line 50A, 50B, 50C, and 50D. Due to the fact that the entire outer periphery 68 of the wick member 24 extends beyond the outer periphery 40 of the membrane shell 22, the wick member 24 is able to absorb and transport water into the compartment at a faster rate. Due to the fact that it is sealed to the panels 22A and 22B of the membrane shell 22 along the entire line 50, the wick member 24 functions to divide the compartment 30 into a first compartment section 30A and a second compartment section 30B.

In the embodiment shown by FIGS. 4–6, the metal chlorite component is preferably contained exclusively in one compartment, say compartment section 30A, and the acid component is contained exclusively in the other compartment, say compartment section 30B (the additive(s) 36 can be placed in one or both compartment sections). The compartment division further prevents a premature reaction of metal chlorite and acid in the event of an inadvertent exposure to water prior to the intended use of the device. For example, when the device 20 is immersed in water in accordance with its intended use, the wick member 24 absorbs a relatively large amount of water and transports the water into the first and second compartment sections 30A and 30B such that metal chlorite in the first compartment section and acid in the second compartment section contact the water, dissolve in the water, traverse the wick divider, come into contact with one another and react to produce chlorine dioxide in the compartment 30. A small amount of water will not be sufficient to allow the components to traverse the wick divider and react. It is only when a

12

substantial amount of water enters the device that the metal chlorite and acid component come into contact with one another to generate chlorine dioxide. A small amount of water vapor that may enter the device through the membrane shell 22 is absorbed by the chemicals.

The wick divider 24 gives the inventive device a longer shelf life than the shelf life of the prior art devices and allows the device to be produced in normal environments (as compared to low humidity environments required for production of prior art devices). Special moisture-resistant packaging is not required to protect against ambient moisture exposure.

Additional uses of the first and second compartment sections 30A and 30B of the embodiment shown by FIGS. 4–6 can be advantageously made to fit particular applications. For example, a mixture of the metal chlorite component and acid component can be placed in both compartment sections. This arrangement is advantageous in that the reaction occurs more quickly. Alternatively, a mixture of the metal chlorite component and acid component can be placed in one compartment section and one or more additives can be placed in the second compartment section. This arrangement might be advantageous in applications wherein the additive might prematurely react with the metal chlorite and acid.

The embodiment shown by FIG. 7 is the same as the embodiment shown by FIGS. 4–6 except the membrane shell 22 (including both the panel member 22A and the panel member 22B) includes a plurality of relatively small openings 80 (e.g., 50–500 microns in diameter) extending from the outside of the membrane shell into the first and second compartment sections 30A and 30B. The openings 80 facilitate the passage of liquid (e.g., water and aqueous solution of chlorine dioxide) into and out of the compartment 30. The openings 80 can further reduce the amount of time required for the desired aqueous chlorine dioxide solution to be generated. Each embodiment of the inventive device can include similar openings.

Referring now to FIGS. 8 and 9, another embodiment of the inventive device 20 is illustrated and will be described. The embodiment shown by FIGS. 8 and 9 is the same as the embodiment shown by FIGS. 4–6, except that an additional seal is made through the device along a line 50E which extends from the line 50B across the middle section of the device to the line 50C. The seal (e.g. formed by stitches) extends from the outside of the panel section 22B though the wick member 24 to the outside of the panel member 22A to effectively divide the compartment into four (4) compartment sections, 30A1, 30A2, 30B1 and 30B2. The plurality of compartments is useful for various applications. For example, as shown by FIG. 9, an acid component 34 can be placed in compartment section 30A1, a metal chlorite component 32 can be placed in compartment section 30B1, a first additive 36A can be placed in compartment section 30B2 and a second additive 36B can be placed in compartment section 30A2. This arrangement is useful in applications wherein the release of one or more additives requires special conditions. For example, if a surfactant needs more water to function than will be brought in by the wick member, small perforations can be made in the membrane shell over the section of the device containing the surfactant to allow more water to enter into this section of the device when the device is placed in water.

FIG. 10 illustrates an embodiment of the invention that is the same as the embodiment shown by FIGS. 8 and 9 except the that the seal made through the device along line 50E only

US 6,764,661 B1

13

extends from the outside of the panel section 22B to the wick member 24 thus creating a device having three compartment sections, 30A, 30B1 and 30B2. Again, the number of compartment sections can be varied to suit virtually any application.

Referring now to FIGS. 11 and 12, yet another embodiment of the inventive device 20 is illustrated. This embodiment is the same as the embodiment shown by FIGS. 4–6 except that it includes two wick members 24, 24A and 24B. The wick members 24A and 24B are sealed together with two the panel members 22A and 22B along the entire line 50, that is continuously along the line 50A, 50B, 50C and 50D. The use of two wick members 24 increases the wicking ability of the device 20 resulting in faster absorption and transport of water into the compartment 30. The use of two wick members also makes it possible to divide the compartment 30 into a large number of compartment sections. As shown by FIGS. 11 and 12, the wick members 24A and 24B divide the compartment 30 into compartment sections 30C, 30D and 30E. If desired, the device can be sealed along its mid-section (as in the embodiments shown by FIGS. 8–10) to create, for example, 5, 6 or virtually any number of compartment sections.

FIGS. 13–23 illustrate certain embodiments of the inventive device 20 that are designed to accommodate government regulations and restrictions regarding shipping and handling of the device. For example, certain federal and state Department of Transportation regulations may prevent the device from being shipped in a way that would allow the acid and metal chlorite to come into contact with one another in the event of accidental exposure to water unless the package for the device includes a warning such as "DANGEROUS WHEN WET" and special handling and shipping requirements are met.

Referring now to FIGS. 13–15, a first embodiment of the inventive device 20 that is designed to accommodate government regulations and restrictions is illustrated. This embodiment of the inventive device 20 is the same as the embodiment shown by FIGS. 4–7 in all respects except that the first compartment section 30A includes the metal chlorite component 32, and the second compartment section 30B includes a sealable opening 90 therein. The metal chlorite component 32 is sealed in the compartment 30A by the seal extending along the entire line 50, that is continuously along lines 50A, 50B, 50C and 50D. The seal along line 50A, however, does not extend through the panel 22A of the membrane shell 22, leaving the opening 90 in the compartment 30B. An adhesive strip 94 extends along the top portion of the device and is sealed to the device along the line 50A.

The acid component 34 is not initially placed in the device. Rather, the acid component 34 is placed in a separate package 98 (FIG. 15) which can be included in the main package 74 for the device. This prevents the acid component 34 and metal chlorite 32 from coming into contact with one another in the case of accidental exposure of the device to water. In this embodiment, the acid component 34 is preferably in the form of a tablet 96. Alternatively, for example, the acid component 34 can be an acid powder wrapped in a material with wicking action, preferably the same material used to form the wick member 24. The acid is placed in the device with the wrapping thereon. This further delays the reaction between the metal chlorite and acid and provides additional reaction control, if necessary, when the device is placed in water. The separate package 98 can be formed of any water impervious material (e.g., laminated foil).

Although the adhesive strip 94 is preferred, any means for resealing the opening 90 can be used. For example, Velcro®, buttons, clamps, staples, zippers or other sealing means can be used.

14

At the point of use, the user merely removes the acid component 34 (e.g., the tablet 96) from the package 98 and inserts it into the second compartment section 30B through the opening 90 therein (FIG. 14 shows the device with the acid tablet 96 already inserted therein). The user then merely seals the device by pressing the top portion of the panel member 22A against the adhesive strip 94 (typically a protective paper coating must first be removed from the adhesive strip 94) and places the device in water (at this point the device functions in the same manner as the device shown by FIGS. 4–7). The user also has the option to add other components, e.g., one or more additives, additional weights, etc. just prior to use of the device. If desired, the acid component 34 and/or one or more additives 36 can be initially sealed in the first compartment section 30A and the metal chlorite component 32 can be separately packaged for insertion at the point of use.

The same features (e.g., the opening 90 and adhesive strip 94) can be employed in connection with the other embodiments of the inventive device. For example, FIG. 18 illustrates an embodiment similar to the embodiment of the inventive device shown by FIGS. 1–3 (e.g., the wick member is not sealed on all sides allowing the chemicals to commingle) except it includes the opening 90, adhesive strip 94, etc.).

FIGS. 16, 17 and 19 illustrate a second embodiment of the inventive device 20 that is designed to accommodate government regulations and restrictions regarding shipping and handling of the device. In this embodiment, the device 20 further comprises a manually openable ampule 100. The ampule 100 is positioned in the second compartment section 30B and contains the acid component 34. The ampule 100 is impervious to water and thereby prevents the acid component 34 from coming into contact with the metal chlorite component 32 until the ampule is manually opened. Alternatively the ampule 100 can be positioned in the first compartment section 30A and contain the metal chlorite component 32.

The ampule 100 is merely a safety device—it prevents the acid component 34 from contacting the metal chlorite component 32 and/or other chemicals in the compartment 30 in the event the device is prematurely exposed to or even immersed in water. The device 20 is assembled with the ampule 100 sealed therein. At the point of use, prior to placing the device 20 in water, the user merely manipulates the device 20 to break the ampule 100 such that the acid component 34 is released therefrom into the compartment 30B. The device 20 then functions in its intended manner, e.g., in the same manner in which the embodiment of the device 20 shown by FIGS. 4–7 functions.

The ampule 100 can be made out of any water and acid impervious material. For example, the ampule 100 can be made out of polyvinyl chloride, glass or plastic. The ampule 100 is designed such that simple hand pressure can break the ampule open. For example, as shown by FIG. 16, the ampule 100 can include a weak point 102 which allows the ampule 100 to be easily broken open by the user.

Again, the same features (e.g., the ampule 100) can be employed in connection with all of the embodiments of the inventive device 20. For example, FIG. 19 illustrates use of ampule 100 in connection with the embodiment of the inventive device 20 shown by FIGS. 1–3; i.e., the acid component 34 is contained in the ampule 100 which is in turn sealed within the compartment section 30B. Inasmuch as the ampule contains the acid, this embodiment of the device functions similarly to the embodiment of the device

US 6,764,661 B1

15

shown by FIGS. 4–6 in that the metal chlorite component and acid component are not allowed to commingle prior to use of the device.

Referring now to FIGS. 20–23, yet another embodiment of the inventive device 20 designed to accommodate government regulations and restrictions regarding shipping and handling of the device is illustrated. This embodiment of the device consists of a kit 110 which allows the user to complete assembly of the device 20 at the point of use. The kit 110 includes a first chemical unit 112, a second chemical unit 130 and attachment means, such as an adhesive strip 140, attached to one of the first chemical unit and the second chemical unit for allowing the units to be attached together to assemble the device.

The first chemical unit 112 includes a first membrane shell 114 and a first wick member 116 connected to the first membrane shell and forming a first compartment section 118 between the first membrane shell and the first wick member. The first compartment section 118 contains the metal chlorite component 32. The first wick member 116 is capable of absorbing water and transporting water into the first compartment section 118. The first membrane shell 114 and first wick member 116 are sealed together along a line 150 (i.e., along lines 150A, 150B, 150C and 150D). A weight 170 is included in the first compartment section 118 for causing the assembled device to submerge when placed in water by the user.

The second chemical unit 130 includes a second membrane shell 132, a second wick member 134 connected to the second membrane shell and forming a second compartment section 136 between the second membrane shell and the second wick member. The second compartment section 136 contains the acid component 34. The second wick member 134 is also capable of absorbing water and transporting water into the second compartment section. The second membrane shell 132 and second wick member 134 are sealed together along a line 150 (i.e., along lines 150A, 150B, 150C and 150D).

An adhesive strip 140 is attached to the first wick member 116 of the first chemical unit 112 adjacent to the outer edge of the first wick member. The adhesive strip 140 allows the first chemical unit 112 and second chemical unit 130 to be attached together at the point of use. It is desirable that the adhesive strip 140 be as close to the outer edge of the wick member 116 as possible so as to not inhibit the flow of water and dissolved materials in and out of the compartments 118 and 136.

Except for the chemicals they contain and the adhesive strip 140 on the first chemical unit 112, the first chemical unit and second chemical unit 130 are essentially identical. Each unit is placed in an envelope 180 and placed in single package for shipment.

At the point of use, the user merely removes the first chemical unit 112, and second chemical unit 130 from their individual packages 180, removes the paper cover from or otherwise activates the adhesive strip 140 and sticks the two units together such that the first wick member 116 and second wick member 134 are in alignment and facing one another. The user then inserts the device in water (at this point the device functions in essentially the same manner as the device shown by FIGS. 4–7).

Although the adhesive strip 140 is preferred, any means for connecting the first chemical unit 112 and second chemical unit 130 together can be employed. For example, Velcro®, buttons, snaps, clamps or other attachment means can be used.

16

Production of the Inventive Device 20

Each embodiment of the inventive device 20, including the components of the kit 110, can be produced using a variety of methods. For example, in one method of producing the embodiments of the device 20 shown by FIGS. 1–7, the wick member 24 is placed between the panels 22A and 22B forming the membrane shell 22. In order to produce a device such as the device shown by FIGS. 4–6, the entire outer periphery 68 of the wick member 24 extends beyond the outer periphery 40 of the membrane shell 22. The panels 22A and 22B and wick member 24 are then sealed just inside the outer periphery 40 of the panels such that only a small opening allowing access to the compartment 30 between the panels remains. The metal chlorite composition and acid composition is then placed into the appropriate compartment section and the opening allowing access to the compartment 30 is sealed to completely enclose the compartment 30 as well as the compartment sections therein.

The panels 22A and 22B and wick member 24 can be sealed together by a variety of means such as gluing, heat sealing, pressure sealing, stapling or sewing. Preferably, the panels 22A and 22B are heat sealed to the wick member 24.

In producing the device illustrated by FIGS. 11 and 12, a panel 22A is placed on top of a corresponding wick member 24 and sealed just inside the outer periphery 40 of the panel 22A such that only a small opening remains for access to the compartment between the panel and the wick member. The metal chlorite component is then placed into the compartment and the opening allowing access to the compartment is sealed. The process is then repeated to create an identical arrangement containing the acid component. The two pouches are then placed together at the wick member surfaces and sealed together.

The embodiments of the device shown by FIGS. 13–23 can be produced in a similar fashion.

For example, in the embodiment shown by FIGS. 4–6 of the drawings, the panels 22A and 22B forming the membrane shell 22 are formed of a non-woven polyethylene material (Tyvek® brand sold by Du Pont). The wick divider 24 is made out of non-synthetic cotton fiber (e.g., Scott® paper towel). Approximately 0.5 grams of citric acid are contained in the first compartment section 38. Approximately 0.5 grams of sodium chlorite are contained in the second compartment section 30B. The device 20 is then immersed in approximately 1 liter of water to produce an aqueous solution containing approximately 100 ppm of chlorine dioxide. This solution can be used as a disinfectant or for a variety of other purposes.

Operation of the Inventive Device 20

In use, an embodiment of the inventive device 20, as described above, is first selected for the particular application involved (taking into account applicable shipping and handling regulations). The amount and concentration of chlorine dioxide solution to be generated is considered with respect to the amounts of the metal chlorite component, acid component and other chemicals utilized and the size of the device selected.

Generally, chlorine dioxide solutions useful as antimicrobial agents have a chlorine dioxide concentration of from about 0.1 ppm to about 1000 ppm. Therefore, one liter of a 50 ppm solution can be prepared by dissolving 0.5 grams of sodium chlorite in water. The amount of acid needed can be calculated accordingly. However, the acid is usually present in stoichiometric excess to ensure that the reaction goes to

US 6,764,661 B1

17

completion and the maximum amount of chlorine dioxide is generated from the metal chlorite. Therefore, the amount of acid should be sufficient to provide an excess of acid beyond that needed to neutralize the alkalinity of the metal chlorite in the water. Preferably, the amount of acid should be sufficient to maintain the pH below 5, preferably below 3, when in contact with the metal chlorite.

The device 20 is then contacted with (e.g., immersed in) a container 200 of water. As shown by FIG. 24, water is absorbed by the wick member 24 (or wick members 116 and 134) and transported by the wick member(s) into the compartment 30 or compartment sections 30A, 30B, 118, 136, etc. Metal chlorite and acid in the compartment or compartment sections then dissolve in the water and react to produce chlorine dioxide gas. If the metal chlorite, acid and other chemicals are separated by the wick member and contained in individual compartments, the chemicals individually dissolve in the water and the various aqueous solutions formed traverse the wick divider and commingle. Commingling of the solutions results in the reaction of the chemicals and the production of chlorine dioxide gas. The chlorine dioxide gas then exits the device through the membrane shell 22 and possibly, to some extent, the wick divider and transforms the surrounding water into an aqueous chlorine dioxide or acidified sodium chlorite solution. Some of the aqueous solution formed in the device may also enter the container of water through the wick member where the components may also react to produce additional chlorine gas.

Depending on the material used to form the membrane shell, water may also enter the device and aqueous solution may also exit the device through the membrane shell.

Thus, the present invention has many advantages over the prior art. The wick member (or members) carries out many important functions. First, it absorbs water and transports the water into the compartment(s) in the device in a controlled manner. The wick member (or members) greatly decreases the time required for water to get into the device yet keeps the chemicals in the device from prematurely reacting. The size, shape and number of compartments within the inventive device can be easily varied to fit virtually any application.

The embodiments of the device shown by FIGS. 13–23 allow the device to be easily packaged, shipped and handled providing the device with a tremendous advantage over the prior art devices used heretofore.

The following examples are provided to further illustrate the effectiveness of the inventive device.

EXAMPLE 1

A microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B) was cut and sealed with a heat-sealing device to make a single compartment pouch approximately 1 inch by 2 inches. The pouch was filled with a mixture of 0.5 grams powdered technical grade sodium chlorite and 0.5 grams powdered citric acid. The pouch was then heat sealed and placed into 500 mL tap water at a temperature of 75° F. The concentration of chlorine dioxide gas in the solution was measured with a spectrophotometer by recording the absorbance of the solution at 360 nm and using a molar absorptivity of 1,100 liters per mole-cm. Measurements were taken at five-minute intervals for 25 minutes. The results are shown in Table 1.

18

TABLE 1

| Time | Concentration |
| --- | --- |
| 5 minutes | 2.1 ppm |
| 10 minutes | 5.2 ppm |
| 15 minutes | 8.5 ppm |
| 20 minutes | 11.3 ppm |
| 25 minutes | 16.5 ppm |

The results show by Table 1 demonstrate that in the absence of a wick member, chlorine dioxide solutions are produced relatively slowly, e.g., it took approximately 25 minutes to produce a 16.5 ppm chlorine dioxide solution.

EXAMPLE 2

A microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B) was cut and sealed with a heat-sealing device to make a single compartment pouch approximately 1 inch by 2 inches. The pouch was then penetrated using a sewing needle so that approximately 30 holes about the size of the end of the needle (i.e., 0.05 mm) were made in the pouch. The pouch was filled with a mixture of 0.5 grams powdered technical grade sodium chlorite and 0.5 grams powdered citric acid. The pouch was then heat sealed and placed into 500 mL tap water at a temperature of 75° F. The concentration of chlorine dioxide gas was measured with a spectrophotometer by recording the absorbance of the solution at 360 nm and using a molar absorptivity of 1,100 liter per mole-cm. Measurements were taken at five-minute intervals for 20 minutes. The results are shown in Table 2.

TABLE 2

| Time | Concentration |
| --- | --- |
| 5 min. | 3.0 ppm |
| 10 min. | 12.2 ppm |
| 15 min. | 28.1 ppm |
| 20 min. | 29.3 ppm |

Table 2 demonstrates that the small perforations in the device allowed the water to enter the device more quickly and resulted in a faster production rate for the chlorine dioxide solution, e.g., it took 20 minutes to produce a 29.3 ppm solution.

EXAMPLE 3

The device of the present invention, in a form such as the embodiment shown by FIGS. 4–6, was constructed and compared to the prior art devices shown in Examples 1 and 2. The membrane shell (the panels 22A and 22B) was made of a microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B). The wick member 24 was made of Scott® brand "Ultrawipes" paper towel.

The membrane shell material and wick member were cut and sealed with a heat-sealing device to make the device (including first and second compartment sections) which was approximately 1 inch by 2 inches. The first compartment section was filled with 0.5 grams powdered technical grade sodium chlorite and the second compartment section was filled with 0.5 grams powdered citric acid. The pouch was then heat sealed and placed into 500 mL tap water at a temperature of 75° F. The concentration of chlorine dioxide

US 6,764,661 B1

| 19 | 20 |

gas was measured with a spectrophotometer by recording the absorbance of the solution at 360 nm and using a molar absorptivity of 1,100 liter per mole-cm. Measurements were taken at five-minute intervals for 15 minutes. The results are shown in Table 3.

TABLE 3

| Time | Concentration |
|------|---------------|
| 5 min. | 31.1 ppm |
| 10 min. | 39.7 ppm |
| 15 min. | 50.0 ppm |

Table 3 clearly shows that the device of the present invention produces chlorine dioxide solutions much more quickly than those of the prior art, e.g., it took only 15 minutes to produce a 50.0 ppm solution. The wick member rapidly absorbed water and transported the water into the device causing the metal chlorite and acid to dissolve, traverse the wick divider and react to produce chlorine dioxide in a relatively short amount of time. The chlorine dioxide immediately passed through the membrane shell to form the chlorine dioxide solution.

A number of inventive devices were assembled and tested as described above, except other types of paper towel material were used to form the wick member 24. Each device worked in the desired manner.

EXAMPLE 4

The inventive device was constructed as described above in Example 3. This time, however, each compartment section was filled with 0.25 grams of powdered technical grade sodium chlorite and 0.25 grams powdered citric acid so that the total amount of dry chemicals in the device was 1.0 grams. The pouch was then heat sealed and placed into 500 mL tap water at a temperature of 75° F. The concentration of chlorine dioxide gas was measured with a spectrophotometer by recording the absorbance of the solution at 360 nm and using a molar absorptivity of 1,100 liter per mole-cm. Measurements were taken at five-minute intervals for 10 minutes. The results are shown in Table 4.

TABLE 4

| Time | Concentration |
|------|---------------|
| 0 min. | 0 ppm |
| 5 min. | 41.48 ppm |
| 10 min. | 79.30 ppm |

Table 4 shows that the device of the present invention produces chlorine dioxide solutions even more quickly than those of the prior art when a mixture of metal chlorite and acid is placed in each compartment section, e.g., it took only 10 minutes to produce a 79.30 ppm solution.

| | | | PPM ClO₂ | | |
|---|---|---|---|---|---|
| | | | Time (Minutes) | | |
| | 5 | 10 | 15 | 20 | 25 |
| Example 1 | 2.1 | 5.2 | 8.5 | 11.3 | 16.5 |
| Example 2 | 3.0 | 12.2 | 28.1 | 29.3 | |
| Example 3 | 31.1 | 39.7 | 50.0 | | |
| Example 4 | 41.48 | 79.3 | | | |

Two 2.5"×3" pouches (P1 & P2) were produced in essentially the same manner described in Example 3 above, i.e.,

each pouch included a membrane shell formed of microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B). Pouch P1, however, did not include a wick member.

Each pouch was filled with 0.5 g citric acid and 0.5 g sodium chlorite. In pouch P1, the wick member (made of Scott® brand "Ultrawipes" paper towel) provided a two-compartment pouch and separated the citric acid from the sodium chlorite. In Pouch P2 (no wick divider) the sodium chlorite and citric acid were mixed together in the single compartment provided by the pouch.

Each pouch was tested in a 39-liter test chamber. In each test, the air inside the chamber was exchanged at a rate of 1.3 liters per minute and had a relative humidity of approximately 50%. The chlorine dioxide concentration inside the test chamber was monitored using an Interscan chlorine dioxide meter equipped with an Intech data logger. In each test, the atmosphere inside the test chamber was monitored for chlorine dioxide for ten minutes prior to introduction of the pouch, for two hours while the pouch remained inside the test chamber, and for ten minutes after the pouch was removed. If no chlorine dioxide was detected from the sample, a known chlorine dioxide emitter was placed inside the test chamber to verify the proper function of the test equipment. The results are described below.

Results P1: The chlorine dioxide concentration inside the test chamber never reached detectable limits during the two hour test period. The known chlorine dioxide emitter was placed in the test chamber at the end of the two hour test period and allowed to produce a chlorine dioxide gas concentration of 1.2 ppm chlorine dioxide to confirm test instrument function.

Results P2: Chlorine dioxide gas reached detectable limits within two minutes of sample introduction into the test chamber and reached an equilibrium concentration of about 2.96 ppm ClO₂ in about twenty minutes. This suggests a chlorine dioxide production rate of about 0.07 milligrams ClO₂ per hour.

The results show that a device constructed according to the present invention with a wick member divider separating the citric acid from the sodium chlorite minimizes or prevents the production of chlorine dioxide gas. Thus, the device of the present invention will not be activated by ambient moisture from the air and will have an extended shelf life.

EXAMPLE 6

The device of the present invention, in a form such as the embodiment shown by FIGS. 1–3, was constructed and compared to the prior art devices shown in Examples 1 and 2. The membrane shell (the panels 22A and 22B) was made of a microporous, hydrophobic non-woven polyethylene sheet material (Tyvek® brand sold by E.I. Du Pont de Nemours & Co.—type 1059B). The wick member 24 was made of Scott® brand "Ultrawipes" paper towel.

The device was approximately 1" by 2" in size and filled with a mixture of 0.5 grams technical grade sodium chlorite of 80% purity and 0.5 grams food grade citric acid. The device was then placed into 500 mL tap water at a temperature of about 73° F. The absorbance of the solution was measured with a spectrophotometer at a wavelength of 360 nm and then converted to a mg/l concentration of chlorine dioxide.

US 6,764,661 B1

21

TABLE 5

| Time | Concentration |
|---|---|
| 0 min. | 0 mg/l |
| 5 min. | 19.5 mg/l |
| 10 min. | 61.0 mg/l |
| 15 min. | 79.3 mg/l |

As shown by Table 5, this embodiment of the invention performed extremely well.

### EXAMPLE 7

The device shown by FIGS. 20–23 was produced as described above. The first chemical unit 112 and second chemical unit 130 were stuck together by peeling the paper off the adhesive strip 140 on the first unit and pressing the units together. The compartment section 118 of the first chemical unit 120 contained approximately 50 grams of technical grade sodium chloride. The compartment section 136 of the second chemical unit 130 contained approximately 25 grams of technical grade, anhydrous citric acid. Double-sided adhesive tape was used to form the adhesive strip 140. The device 20 was then placed in a five-gallon container of tap water. It was observed that chlorine dioxide was generated over time and in an amount similar to the device described in Example 3 above.

The preceding examples can be repeated with similar success by substituting the generically or specifically described components and operating conditions of this invention for those used in the examples.

Although certain preferred embodiments of the invention have been described for illustrative purposes, it will be appreciated that various modifications and innovations of the inventive device may be effected without departure from the basic principals which underlie the invention. Changes of this type are therefore deemed to lie within the spirit and scope of the invention except as may be necessarily limited by the inventive claims and reasonable equivalents thereof

What is claimed is:

1. A device for producing an aqueous chlorine dioxide solution when exposed to water comprising:

a membrane shell defining a compartment which includes one or more dry chemical components capable of producing chlorine dioxide gas when exposed to water; and

wick means connected to said membrane shell and extending into said compartment for absorbing water and transporting water into said compartment whereby when said device is exposed to water said wick means absorbs water and transports water into said compartment, said chemical component(s) dissolve in the water and produce chlorine dioxide gas in said compartment, and chlorine dioxide gas exits said compartment through said membrane shell.

2. The device of claim 1 wherein said membrane shell is substantially impervious to liquid and permeable to gas.

3. The device of claim 1 wherein said membrane shell is permeable to liquid and gas.

4. The device of claim 1 wherein said membrane shell is formed of a material selected from the group consisting of polyethylene and polypropylene sheet materials.

5. The device of claim 4 wherein said membrane shell is formed of a microporous, non-woven polyethylene sheet material.

6. The device of claim 1 wherein said wick means is a wick member formed of a material selected from the group consisting cotton pulp and wood pulp.

22

7. The device of claim 6 wherein said wick member is formed of a non-synthetic fibrous cotton material.

8. The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component whereby when water is transported into said compartment metal chlorite and acid in said compartment dissolve in the water and react to produce chlorine dioxide in said compartment.

9. The device of claim 8 wherein said metal chlorite component comprises a metal chlorite selected from the group consisting of alkali metal chlorites and alkaline earth metal chlorites.

10. The device of claim 9 wherein said metal chlorite component comprises a metal chlorite selected from a group consisting of sodium chlorite, potassium chlorite, barium chlorite, calcium chlorite and magnesium chlorite.

11. The device of claim 10 wherein said metal chlorite component is sodium chlorite.

12. The device of claim 8 wherein said acid component comprises an acid selected from the group consisting of citric acid, lactic acid, tartaric acid, maleic acid, malic acid, glutaric acid, adipic acid, acidic acid, sulfamic acid, formic acid, sulfuric acid, hydrochloric acid and phosphoric acid.

13. The device of claim 12 wherein said acid component is citric acid.

14. The device of claim 8 wherein said acid component comprises an acid precursor that produces an acid when exposed to water.

15. The device of claim 1 wherein said wick means is a wick member having a first end which extends into said compartment and an opposing second end which extends beyond the outer edge of said membrane shell.

16. The device of claim 1 wherein said membrane shell comprises two panel members fastened together to form said compartment.

17. The device of claim 16 wherein said wick means is a wick member which is positioned between and fastened to at least one of said panel members and divides said compartment into first and second compartment sections.

18. The device of claim 17 wherein at least 15% of the outer periphery of said wick member extends beyond the outer periphery of said membrane shell.

19. The device of claim 17 wherein the entire outer periphery of said wick member extends beyond the outer periphery of said membrane shell.

20. The device of claim 17 wherein said compartment includes a metal chlorite component and an acid component, said metal chlorite component being contained within said first compartment section and said acid component being contained within said second compartment section.

21. The device of claim 1 wherein said wick means is a wick member which divides said compartment into first and second compartment sections.

22. The device of claim 21 wherein said compartment includes a metal chlorite component and an acid component, said metal chlorite component being contained within said first compartment section and said acid component being contained within said second compartment section.

23. The device of claim 21 wherein said compartment includes a mixture of a metal chlorite component and an acid component, a portion of said mixture being contained within said first compartment section and a portion of said mixture being contained within said second compartment section.

24. The device of claim 22 further comprising a manually openable ampule, said ampule being positioned in said second compartment section and containing said acid component, said ampule being impervious to water and

US 6,764,661 B1

23

preventing said acid component from coming into contact with said metal chlorite component until said ampule is manually opened.

25. The device of claim 22 further comprising a manually openable ampule, said ampule being positioned in said first compartment section and containing said metal chlorite component, said ampule being impervious to water and preventing said metal chlorite component from coming into contact said acid component until said ampule is manually opened.

26. The device of claim 21 wherein:

said first compartment section includes a metal chlorite component, said metal chlorite component being sealed in said first compartment section; and

said second compartment section includes an sealable opening therein for allowing an acid component to be placed in said second compartment section prior to exposure of said device to water.

27. The device of claim 21 wherein:

said first compartment section includes an acid component, said acid component being sealed in said first compartment section; and

said second compartment sections includes a sealable opening therein for allowing a metal chlorite component to be placed in said second compartment section prior to exposure of said device to water.

28. The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component, and said device further comprises a manually openable ampule, said ampule being positioned in said first compartment and containing said acid component, said ampule being impervious to water and preventing said acid component from coming into contact said metal chlorite component until said ampule is manually opened.

29. The device of claim 1 wherein said compartment includes a metal chlorite component and an acid component, and said device further comprises a manually openable ampule, said ampule being positioned in said first compartment and containing said metal chlorite component, said ampule being impervious to water and preventing said metal chlorite component from coming into contact said acid component until said ampule is manually opened.

30. The device of claim 1 wherein said compartment includes a metal chlorite component and has a sealable opening therein for allowing an acid component to be placed in said compartment prior to exposure of said device to water.

31. The device of claim 1 wherein said compartment includes an acid component and has a sealable opening therein for allowing a metal chlorite component to be placed in said compartment prior to exposure of said device to water.

32. The device of claim 1 wherein said wick means is a wick member which divides said compartment into a plurality of compartment sections.

33. The device of claim 1 wherein said wick means comprises at least two wick members, said wick members dividing said compartment into at least two compartment sections.

34. The device of claim 1 further comprising weight means attached to one of said membrane shell and said wick means for causing said device to sink when placed in a body of water.

35. The device of claim 1 further comprising a water-resistant package surrounding and enclosing said membrane shell and said wick means.

36. The device of claim 1 wherein said membrane includes a plurality of openings therein for facilitating the passage of liquid into and out of said device.

24

37. A device for producing an aqueous chlorine dioxide solution when placed in water comprising:

a membrane shell defining a compartment, said membrane shell allowing the passage of chlorine dioxide gas from said compartment but being impervious to water, said compartment including a metal chlorite component and an acid component;

a wick member connected to said membrane shell, said wick member extending into said compartment and dividing said compartment into a first compartment section containing said metal chlorite component and a second compartment section containing said acid component, said wick member being capable of absorbing water and transporting water into said first and second compartment sections whereby when said device is placed in water said wick member absorbs water and transports water into said compartment, said metal chlorite and acid dissolve in the water, traverse said wick divider, and react to produce chlorine dioxide gas in said compartment, and chlorine dioxide gas passes through said membrane shell.

38. The device of claim 37 wherein said membrane shell is formed of a material selected from the group consisting of polyolefin sheet materials.

39. The device of claim 37 wherein said wick member is formed of non-synthetic fibers of cotton.

40. The device of claim 37 wherein said wick member includes a first end which extends into said compartment and an opposing second end which extends beyond the outer edge of said membrane shell.

41. The device of claim 37 wherein said wick member extends through said compartment and includes a first end extending beyond the outer edge of one side of said membrane shell and a second end extending beyond the outer edge of a second side of said membrane shell.

42. The device of claim 37 wherein the entire outer periphery of said wick member extends beyond the outer periphery of said membrane shell.

43. The device of claim 28 wherein said membrane shell comprises two panel members fastened together to form said compartment.

44. The device of claim 43 wherein said wick member is sandwiched between said panel members.

45. The device of claim 37 further comprising a manually openable ampule, said ampule being positioned in said second compartment section and containing said acid component, said ampule being impervious to water and preventing said acid component from coming into contact with said metal chlorite component until said ampule is manually opened.

46. The device of claim 37 further comprising a manually openable ampule, said ampule being positioned in said first compartment section and containing said metal chlorite component, said ampule being impervious to water and preventing said metal chlorite component from coming into contact said acid component until said ampule is manually opened.

47. The device of claim 37 wherein:

said first compartment section includes a metal chlorite component, said metal chlorite component being sealed in said first compartment section; and

said second compartment section includes a sealable opening therein for allowing an acid component to be placed in said second compartment section prior to placement of said device in water.

48. The device of claim 37 wherein:

said first compartment section includes an acid component, said acid component being sealed in said first compartment section; and

US 6,764,661 B1

25

26

said second compartment sections includes an sealable opening therein for allowing a metal chlorite component to be placed in said second compartment section prior to placement of said device in water.

**49.** The device of claim **37** further comprising means attached to one of said membrane shell and said wick member for causing said device to sink when placed in a body of water.

**50.** The device of claim **37** further comprising a water-resistant package surrounding and enclosing said membrane shell and said wick member.

**51.** The device of claim **37** wherein said membrane shell includes a plurality of openings therein for facilitating the passage of liquid into and out of said device.

**52.** A kit for allowing a device for producing an aqueous chlorine dioxide solution when the device placed in water to be assembled at the point of use comprising:

a first chemical unit including:

a first membrane shell;

a first wick member connected to said first membrane shell and forming a first compartment section between said first membrane shell and said first wick member, said first compartment section containing a metal chlorite component, said first wick member being capable of absorbing water and transporting water into said first compartment section;

a second chemical unit including:

a second membrane shell;

a second wick member connected to said second membrane shell and forming a second compartment section between said second membrane shell and said second wick member, said second compartment section containing an acid component, said second wick member being capable of absorbing water and transporting water into said second compartment section; and

means attached to at least one of said first chemical unit and said second chemical unit for attaching said first and second chemical units together to assemble said device, whereby when said device is placed in water said first and second wick members absorb water and transport water into said first and second compartment sections, metal chlorite in said first compartment section and acid in said second compartment section contact the water, dissolve in the water, traverse the wick dividers, and react to produce chlorine dioxide in said compartment sections, and said chlorine dioxide passes from said compartment sections through said first and second membrane shells into the water into which the device is placed.

**53.** The device of claim **52** wherein said first and second membrane shells are formed of a material that is substantially impervious to liquid but allows the passage of gas.

**54.** The device of claim **52** wherein said first and second membrane shells are formed of a material that allows the passage of liquid and gas.

**55.** The device of claim **52** wherein said first and second wick members each include at least one end which extends beyond the outer edge of said corresponding membrane shell.

**56.** The device of claim **52** wherein the entire outer periphery of each of said first and second wick members extends beyond the outer periphery of said corresponding membrane shell.

**57.** The device of claim **52** wherein said means for attaching said first and second wick units together includes adhesive material attached to at least one of said first and second wick members.

* * * * *

US 20130136685A1

(19) **United States**

(12) **Patent Application Publication** (10) Pub. No.: US 2013/0136685 A1

Baselli et al. (43) **Pub. Date:** **May 30, 2013**

(54) **PORTABLE CHLORIE DIOXIDE GENERATOR**

(71) Applicants: **Juan Carlos Baselli**, West Hills, CA (US); **Spencer Blua**, Torrance, CA (US)

(72) Inventors: **Juan Carlos Baselli**, West Hills, CA (US); **Spencer Blua**, Torrance, CA (US)

(21) Appl. No.: **13/684,638**

(22) Filed: **Nov. 26, 2012**

**Related U.S. Application Data**

(60) Provisional application No. 61/563,723, filed on Nov. 25, 2011.

**Publication Classification**

(51) **Int. Cl.**
    *C01B 11/02* (2006.01)

(52) **U.S. Cl.**
    CPC ............. *C01B 11/024* (2013.01); *C01B 11/022* (2013.01)
    USPC ......................................... **423/477**; 422/164

(57) **ABSTRACT**

The present invention provides a safe, disposable and biodegradable chlorine dioxide micro generator that uses water soluble paper and hydrogel or compressed cellulose encased in filter paper pouch. The chemicals are kept in a stabilize form until activated by the addition of water. Multiple levels of protection against early exposure to water such as a foil pouch and an impermeable outer container allow for the safe transportation and storage in small, ready for deployment amounts of the chemicals. Wicking materials packaged around the chemicals provide for the ready introduction of water to the chemicals at the proper time. Water dissolves the paper walls of the chemical pack housings and then the water facilitates the reaction between the acid and the sodium chlorite to form chlorine dioxide gas as will be described further hereunder.



Patent Application Publication     May 30, 2013  Sheet 1 of 3       US 2013/0136685 A1



Figure 1

Figure 2





Figure 3

Figure 4

Figure 5



Figure 6

1

## PORTABLE CHLORIE DIOXIDE GENERATOR

### CROSS REFERENCE TO RELATED APPLICATIONS

[0001]   This application claims the benefit of U.S. Provisional Application 61/563,723, filed Nov. 25, 2011, entitled Portable Chlorine Dioxide Generator, which is incorporated herein by reference.

### BACKGROUND OF THE INVENTION

[0002]   1. Field of the Invention

[0003]   The present application relates to a disposable and biodegradable chlorine dioxide micro generator from portable, stable chemicals, using for example water soluble paper and hydrogel or compressed cellulose encased in a filter paper pouch.

[0004]   2. Description of the Prior Art

[0005]   Chlorine Dioxide (herein also referred to by "ClO2" or "ClO$_2$") is a known biocide and disinfectant. It works by oxidizing single cell organisms in a known manner to kill the organism. Chlorine dioxide is currently used in commercial buildings to disinfect and deodorize various rooms and other enclosed areas. It has been known to be used in gymnasiums and other sports facilities to prevent staph infections while simultaneously deodorizing the facility. However, ClO2 is an unstable chemical that breaks down especially in ultraviolet light and must be generated on site by large, bulky industrial equipment making it inaccessible to smaller sites at a reasonable cost.

[0006]   Because of the inherent instability of chlorine dioxide, it is currently generated as needed. This is typically done by mixing a small amount of sodium chlorite and acids from large canister reservoirs. The sodium chloride is mixed with the acid, such as for example, Citric acid, sodium bisulfate, hydrochloric acid, etc. in large, industrial machinery. The separate canisters prevent unintended or premature mixing of the chemicals, but require porting around excess equipment to the desired site. It is therefore desired to provide a portable chlorine dioxide generator that can deploy small amounts of chlorine dioxide gas, while ensuring that the gas generation does not occur before the point of deployment. While the chlorine dioxide is not poisonous, it is at a minimum unpleasant or unhealthy to breathe, analogous to many household cleaners and thus premature mixing or "leakage" could have unwanted or deleterious consequences.

### SUMMARY OF THE INVENTION

[0007]   The present invention provides a safe, disposable and biodegradable chlorine dioxide micro generator that uses exposure to water to trigger a reaction between small quantities of provided chemicals, such as sodium chlorite and an acid to produce the chlorine dioxide. In one embodiment, water soluble paper and hydrogel or compressed cellulose encased in a filter paper pouch surround the chemicals and act to wick the water to the chemicals at the time of generation. The chemicals are kept in a dry, stabilized form until activated by the addition of water by multiple levels of protection. These levels include desiccants, physical separation, stabilizers, and impermeable barriers. These levels protect against early exposure to water to allow for the safe storage and

transportation of the chemicals in small, pre-measured amounts of the chemicals suitable for the intended application site.

[0008]   Accordingly, it is a principal object of a preferred embodiment of the invention to provide a one time, single use chlorine dioxide generator that is safe to use, stable during storage and shipment, and is readily deployable.

[0009]   It is another object of the invention to provide a stable environment for the sodium chlorite and acids to exist in a single package without prematurely forming chlorine dioxide.

[0010]   It is a further object of the invention to provide packaging for the chemicals that in the absence of water acts to separate the chemicals, and during introduction of water to the packaging facilitates a reaction between the enclosed chemicals to form chlorine dioxide.

[0011]   Still another object of the invention is to provide in at least one embodiment separate compartments for the chemicals to further forestall a premature or unintended reaction between the chemicals.

[0012]   It is yet another object of the invention according to at least one embodiment to provide cellulose material to act as wick to rapidly introduce water to the chemicals at the time of reaction without interfering with the release of gas from the system.

[0013]   It is an object of the invention to provide improved elements and arrangements thereof in an apparatus for the purposes described which is inexpensive, dependable and fully effective in accomplishing its intended purposes.

[0014]   These and other objects of the present invention will be readily apparent upon review of the following detailed description of the invention and the accompanying drawings. These objects of the present invention are not exhaustive and are not to be construed as limiting the scope of the claimed invention. Further, it must be understood that no one embodiment of the present invention need include all of the aforementioned objects of the present invention. Rather, a given embodiment may include one or none of the aforementioned objects. Accordingly, these objects are not to be used to limit the scope of the claims of the present invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0015]   FIG. 1 is an environmental perspective view of a container housing the components of the system.

[0016]   FIG. 2 is an exploded view of the components of the system.

[0017]   FIG. 3 is a break-away view of the chemical pouch and outer housing according to at least a first embodiment of the invention.

[0018]   FIG. 4 is a break-away view of the chemical pouch and outer housing according to at least a second embodiment of the invention.

[0019]   FIG. 5 is a break-away view of the chemical pouch and outer housing according to at least a third embodiment of the invention.

[0020]   FIG. 6 is a flow diagram showing the steps for implementing the system.

[0021]   Similar reference characters denote corresponding features consistently throughout the attached drawings.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT(S)

[0022]  The present invention is to a single use, compact chlorine dioxide generator. As best shown with reference to the drawings, the system and method for generating chlorine dioxide is shown. The system includes a container 10 (FIG. 1) having a lower cup portion 12 and lid 14 for containing all of the parts of the system and for preventing the introduction of any moisture to the system. As shown in FIG. 2, removal of the lid 14 from the cup 12 allows access to and removal of the optional components of the system 20. Within the cup 12 are initially contained a water measuring cup 22, and a foil pouch 26 containing a chemical pack housing 30 and a desiccant pack 24.

[0023]  In general, the materials are removed from the cup and the chemical pack housing 30 is removed from the foil pouch. A measured amount of water and the chemical pack housing are placed in the cup in the proper orientation, preferably with the chemical pack placed in the cup prior to the water. The water eventually is brought into contact with the chemicals within the chemical pouch 40 and facilitates the reaction between the acid and the sodium chlorite to form chlorine dioxide as will be described further hereunder.

### The Components

[0024]  The cup 12 and lid 14 that comprise the container are preferably made of an impermeable material, such as paper, plastic, etc. In the most preferred form, the cup is made from an impermeable paper so that the elements of the system may be readily be recycled or biodegraded. The container may be an important layer in preventing premature introduction of any water to the chemicals, but in some circumstances may be optional.

[0025]  A foil pouch 26 is provided to house the chemical pack housing 30 during storage and shipment and is used to redundantly protect the chemicals from the premature introduction of moisture or liquids to the chemicals to prevent an unintended reaction of the chemicals with each other. Foil or other impermeable materials can be used on the walls of the pouch 26 to prevent moisture in or out of the pouch.

[0026]  A desiccant 24 is provided within the foil pouch 26 to prevent moisture from accumulating within the foil pouch 26 during shipping and storage. One skilled in the art would understand that the use of a desiccant is well known for lowering the humidity of a closed compartment and that its use or an alternative humidity lowering device is not necessary for the operation of the invention, but is merely provided to maintain a stable environment. The heart of the system, however, is the chemical pack 30 housing the chemical pouch 40 with the active ingredients necessary for generating chlorine dioxide.

### Chemical Pack Construction

[0027]  The chemical pack housing 30 may have many configurations, several of which are described herein. The configuration used in a particular system 20 may vary based on the measure of chemicals used in order to achieve different levels of ClO2 concentrations and with the size of confined environment to be treated.

[0028]  With reference to FIG. 3, the chemical pack housing 30 has an outer filter paper (or other porous or mesh material) wall 32, preferably joined together along a seam 34 joining the halves of the filter paper wall 32 together. Alternatively,

any paper wall of the system could also use other materials other than water soluble paper. For example water soluble film could be used, or even non-dissolvable filtration material could be used as long as water penetrates to allow the desired reaction to occur.

[0029]  Within the filter paper outer wall 34, the chemical pack housing is stuffed with a wicking material such as hydro gel or compressed cellulose 36 or other open cell foam/material/synthetic material, preferably having a high wicking capability. More preferably the cellulose takes the form of a sponge 36 as will be described further hereunder. The wicking material serves several functions. First, the material 36 serves as a physical buffer between the outer wall and the chemical pouch 40 within the outer wall 32. The material isolates and protects the chemical pouch 4 from jostling and from damage during shipment. And in operation, the wicking material 40 also acts to rapidly wick the water from outside the chemical pack housing 30 into contact with the chemical pouch 40 to introduce the water to the chemicals within the pouch 40 to cause the chemical reaction.

[0030]  In a preferred embodiment, the cellulose material of the chemical pack housing 30 is comprised of a number of smaller cellulose blocks 36. Each block may be made of a dehydrated, compressed natural sponge or other cellulose source. By cutting a compressed sponge into approximately $^2/_{16}$" by $^2/_{16}$" cubes, it has been found that the wicking properties of the sponge increases to optimum levels to wick water rapidly to the chemical pouch 40, while allowing for sufficient pathways for the gas created in the chemical reaction to escape between the cellulose cubes better than a single layer or layers of cellulose material.

[0031]  The chemical pouch 40 according to at least one preferred embodiment contains both the sodium chlorite and the activating acid in a single structure. To prevent contact and/or an unintended reaction between the chemicals, a stabilizer is provided with and between the chemicals to forestall reaction. A preferred stabilizer is talcum powder ("talc"), but other stabilizers could also be used such as calcium chloride. One reason that the talcum powder may work well as a stabilizer is that it coats the granular surfaces of the chemicals to create a physical boundary between the chemicals. The talcum powder may also lower humidity reaching the chemicals to further prevent an unintended, premature reaction between the chemicals.

[0032]  The stabilizer allows both of the chemicals to be safely stored within the same compartment. Housing both of the chemicals within the same housing has the benefit that once water is introduced to initiate chemical reaction, the acid and sodium chlorite are in close contact encouraging a full and complete reaction with low barriers to the escaping chlorine dioxide gas. The stabilizer also has the added advantage of providing a long shelf life for the product in the range of two years, well beyond what would be expected for this type of chlorine dioxide generator.

[0033]  Depending on the size/amount of the chemicals and the intended environment that the chemicals will be used in, it may be desirable to store the chemicals in separate compartments to further ensure the chemicals cannot come in contact with each other prior to deployment at the intended site. As shown in FIG. 4, an additional paper barrier 44 can be introduced between the chemicals to keep the chemicals further separated. In this embodiment, it is preferred that the acid, such as citric acid be stored in the top compartment 46 and the sodium chlorite in the bottom compartment 48.

3

Instructions or indicia on the chemical pouch 40 and/or the chemical pack housing 30 may be provided to ensure that the chemicals are deployed in the proper orientation. Having the acids on top of the sodium chlorite as the paper barrier dissolves during introduction of water to the system will ensure the most robust reaction between the acid and the sodium chlorite.

[0034]   Another embodiment is shown in FIG. 5 having two separate pouches, one pouch 40A for the acid and a pouch 40B for the sodium chlorite. The chemicals pouch may be secured in close proximity by a tether 41 linking the pouches 40A & 40B. While shown in loose configuration in the figure, it may more practical to secure the pouches to each other at one or more point such that they maintain proper contiguous or close orientation to each other.

[0035]   The chemical pack housing 30 itself may be fabricating with an outer pack wall 32 formed from filter paper filled with a measured amount of hydro gel (water absorbing polymer) or compressed cellulose 26. The process of fabrication is preferably performed in a room with less than 35% humidity and chemicals holding less than 1% humidity, filling the chemical pouch 40 with compound made with 80% technical grade sodium chlorite, organic acid (i.e., Citric acid, sodium bisulfate, et.) and a stabilizer, then heat sealing the chemical pouch walls 40 together. The chemical pouch 40 is then placed within outer pack ("chemical pack housing") 30 with polymer and heat sealing outer pouch wall 24. This is then placed in the foil pouch 26 along with desiccant 24 and the foil pouch is sealed to create a water tight housing. This foil pouch is then placed with the other components in the water impermeable container 10, with lid sealed over the cup portion 12 to provide a long shelf life container for generating chlorine dioxide at the desired time in a small quantity.

Operation of the System

[0036]   In operation, as shown in the block diagram of FIG. 6, the self-contained chlorine dioxide generator is capable of creating the gas by the mere arrangement of the provided components plus the addition of a small amount of water. Referring to FIGS. 1, 2 and 6, operation of the system will be described.

[0037]   To generate chlorine dioxide from the pre-packaged system, the lid 14 of the container 10 is separated from the cup portion 12. The components, namely, the measuring cup 22 and foil pouch 26 are removed 62 from the container cup portion 12 and set aside

[0038]   The chemical pack housing 30 is prepared by first removing 64 the pack 30 from the protective pouch 26. The desiccant 24 (also in foil pouch 26) is used merely to remove moisture from the interior of the container 10 and is no longer required, so may be discarded or otherwise disposed of or recycled.

[0039]   The proper orientation of the chemical pack housing 30 is then determined to maintain the chemical pouch within the pack housing in the proper position. The chemical pack housing 30 is then placed 66 in the cup in the desired orientation.

[0040]   With the chemical pouch properly placed in the cup 12, the measuring cup 22 is then filled 68 with the required amount of water (not shown) using indications on the cup or in accordance with provided instructions that may be provided. Once the proper amount of water is measured 66, it is poured into the cup 12 on top of the chemical pouch to initiate generation of the chlorine dioxide.

[0041]   The water is first absorbed by the outer paper wall 32 of the chemical pack housing causing the paper walls to dissolve. The cellulose or hydro gel 36 then acts as a wick to direct the water at the desired rate to the active chemical pouch 40 (or 40A & B). As the water is absorbed by the hydro gel or compressed cellulose 36 in the outer pouch 30, it pushes the inner chemical pouches 40 upward against the outer pouch 30, creating a pillow-like gel bed, where the chemical pouch walls 42 may dissolve and initiate the chemical reaction by mixing all the chemicals together.

[0042]   The outer paper walls 42 continue to dissolve in the water allowing for more water to reach the chemicals and stabilizer within the chemical pouch. Where the chemicals are stored in separate compartments (46,48 FIG. 4) or separate pouches (40A, 40B FIG. 5), interposed walls break down in the water and allow the chemicals to react and proceed analogously to the single pouch embodiment.

[0043]   When sufficient water has permeated into the chemicals to overcome the stabilizer, the acid and sodium chlorite can react with each other to form a chlorine dioxide gas. The gas then percolates out through the cellulose and through gaps in the outer chemical pack housing walls 32 that have dissolved. The gas continues to expand and flow out of the cup 12 into the enclosed environment around the cup. The chlorine dioxide gas oxidizes or otherwise eliminates single celled organisms within the enclosed space around the cup, preferably killing any odor causing organisms. After a short period of time, the chlorine dioxide then begins to break up into salts and water. Since only a small amount of gas per volume of room is required to neutralize the organisms, the amount of salt and water should be negligible and should not create a need for separate cleanup of the resulting byproducts. In this way, the self-contained chlorine dioxide generator generates sufficient gas to deodorize a confined space and breaks up easily to into simple, environmentally friendly compounds. The articles left after the process, namely the chemical pack 30, and active ingredients as well as the paper cup can be recycled or will biodegrade. And unlike the commercial gas generators, there is no industrial equipment or canisters left after the application of ClO2 at the site to haul away.

Slow Release System

[0044]   An alternative to adding water to the cup is to merely deploy the system as the chemical pack housing 30 within the cup and allow the ambient humidity of the surrounding environment to slowly allow the gradual introduction of water to the chemicals. Eventually as the humidity level of the interior of the chemical pack 30 and later chemical pouch 40 rise to the level of the room, the chemicals will slowly react to the water carried by the air to the chemical pouch 40. The time that the humidity takes to reach the chemicals could be enhanced by scoring the walls of the chemical pack 30 or simply by removing the chemical pouch 40 from the chemical pack 30, however this is not desirable because the chemical pack 30 acts as a fuse to delay the introduction of water/humidity to the chemicals and this may be defeated by removing the chemical pouch 40 from the pack. Additionally, the chemical pack housing 30 acts as a physical boundary between the chemicals and the user to further safeguard the user from the chemicals.

Water Suspended Chlorine Dioxide

[0045]   A similar process could also be used to create chlorine dioxide suspended in water by introducing the chemical

US 2013/0136685 A1
4
May 30, 2013

pack housing 30 to a larger volume of water. In such case, certain components of the system may be unnecessary, such as the cup 12 and measuring cup 22. The chemical pack could be provided within the foil pack, and deployment could be as simple as dropping the chemical pack 30 (when removed from the foil pack) into a large volume of water to initiate generation of the gas. If the volume of water is contained in a closed tank of water, the ClO2 will stay within the water for a longer period of time instead of being released from the water as a gas. A pump/sprayer on the tank could be used to spray ClO2 containing water on a desired spot to remove odor or to kill single cell organisms or other affected materials. Alternatively, the pouch could be dropped into an open volume of water, and a mop or similar device could be used to apply the ClO2 containing water.

[0046]  The housing 30 could be provided within a webbing, netting or other housing configuration to prevent the housing from be introduced to downstream pumps, for example in a system that pumps the combined water and chlorine dioxide directly onto the desired areas. Additionally, individual components of the system can be made to be dissolvable or non-dissolvable as needed for various applications.

[0047]  While this invention has been described as having a preferred design, it is understood that it is capable of further modifications, uses and/or adaptations of the invention following in general the principle of the invention and including such departures from the present disclosure as come within the known or customary practice in the art to which the invention pertains and as maybe applied to the central features hereinbefore set forth, and fall within the scope of the invention and the limits of the appended claims. It is therefore to be understood that the present invention is not limited to the sole embodiment described above, but encompasses any and all embodiments within the scope of the following claims.

We claim:

1. A system for generating chlorine dioxide, comprising:
   a chemical pouch housing active chemical ingredients including sodium chlorite and an acid;
   a stabilizer coating said sodium chlorite and said acid to allow for water-free storage of the sodium chlorite and acid in close contact without allowing a reaction between the sodium chlorite and the acid;
   said chemical pouch having a non-water resistant outer wall for allowing water to pass through said wall into said active chemical ingredients;
   wherein introduction of water to said active chemical ingredients activates said active chemical ingredients to form chlorine dioxide.

2. The system for generating chlorine dioxide of claim 1, wherein said active chemical ingredients in said system only include sodium chlorite and an acid.

3. The system for generating chlorine dioxide of claim 1, wherein said chemical pouch outer wall is made of dissolvable paper.

4. The system for generating chlorine dioxide of claim 1, wherein said chemical pouch is contained within a chemical pack outer housing, said chemical pack having a wicking material between at least one outer wall and said chemical pouch to wick water from an outer wall of said chemical pack to said chemical pouch outer wall.

5. The system for generating chlorine dioxide of claim 4, including a foil pouch for storing said chemical pack containing said chemical pouch in a water-free state to prevent water external to said foil pouch from prematurely reaching said active chemicals.

6. The system for generating chlorine dioxide of claim 5, including:
   a nonpermeable cup for storing said foil pouch, chemical pack and chemical pouch in a water-free state during storage; and
   a measuring cup for measuring an amount of water to be added to said active chemicals to form the chlorine dioxide at a preselected time of activation.

7. A method for generating chlorine dioxide, comprising:
   providing a chemical pouch housing a active chemical ingredients including sodium chlorite and an acid, said chemical pouch having a non-water resistant outer wall for allowing water to pass through said wall into said active chemical ingredients during activation of the active chemical ingredients;
   providing a stabilizer within said chemical pouch for coating said sodium chlorite and said acid to allow for stable storage of the sodium chlorite and acid in close contact without allowing a reaction between the sodium chlorite and the acid prior to addition of a preselected amount of water; and
   introducing water to said chemical pouch to cause water to breach through said chemical pouch outer wall and overcome said stabilizer to allow contact between said active ingredients to cause said active chemical ingredients to form chlorine dioxide.

8. The method for generating chlorine dioxide of claim 7, further comprising:
   storing said chemical pouch in a chemical pack;
   said chemical pack having an amount of wicking material within said chemical pack to secure said chemical pouch within said chemical pack and physically separated from at least one portion of said chemical pack wall by said wicking material;
   said chemical pack having a non-water resistant housing wall for allowing water to pass through said housing wall, such that the introduced water contacting the chemical pack wall travels through said chemical pack wall and is wicked into contacting said chemical pouch wall to cause a reaction between said sodium chlorite and said acid.

9. The method for generating chlorine dioxide of claim 8, further comprising:
   providing a foil pouch housing selectively surrounding said chemical pack and chemical pouch for preventing moisture from contacting said chemical pack outer wall prior to introducing water with said chemical pouch.

10. The method for generating chlorine dioxide of claim 9, further comprising:
   providing a cup formed of non-water permeable material for storing said foil pouch, chemical pack and chemical pouch during shipment;
   and for placing said chemical pack containing said chemical pouch within said cup during the introduction of water to the chemical pouch to form chlorine dioxide gas within said cup.

11. A method for generating chlorine dioxide, comprising:
   providing a first non-water permeable housing for storing a chemical pack;
   said chemical pack having outer walls formed of a non-water resistant material;

said chemical pack having a water wicking material stuffing within said chemical pack outer walls and a chemical pouch within said wicking material stuffing;

said chemical pouch having chemical pouch outer walls for containing active chemical ingredients within said chemical pouch outer walls;

said active ingredients comprising at least sodium chlorite and an acid within said chemical pouch;

providing a stabilizer within said chemical pouch to separate said active chemical ingredients and to prevent activation of the active chemical ingredients prior to introduction of a preselected amount of water to the chemical pouch during an activation step;

introducing water to the chemical pouch by removing said chemical pack from said non-water permeable housing and allowing water to contact said chemical pack outer walls;

said introduced water permeating or dissolving said chemical pack outer walls and contacting said wicking material;

said wicking material wicking said introduced water into contact with said chemical pouch outer wall;

said introduced water permeating or dissolving said chemical pouch outer walls and contacting said active ingredients and said stabilizer;

said introduced water dissolving or washing away said stabilizer to allow contact of the sodium chlorite with said acid to form chlorine dioxide.

**12**. The method for generating chlorine dioxide of claim **11**, wherein said stabilizer is a talcum powder.

**13**. The method for generating chlorine dioxide of claim **11**, wherein said chemical pack is replaced within said first non-water permeable housing and the introduced water is brought into contact with the chemical pack within said first non-water permeable housing.

**14**. The method for generating chlorine dioxide of claim **13**, wherein said chemical pack is stored within a second non-permeable housing within said first non-water permeable housing, and said chemical pack is removed from said first non-water permeable housing and from said second non-water permeable housing prior to replacing the chemical pack within said non-permeable housing and the introduced water is then added to the first non-water permeable housing to bring the water into contact with the chemical pack.

**15**. The method for generating chlorine dioxide of claim **14**, wherein said first non-permeable housing is a paper cup and the second said non-permeable housing is a foil pack,

and said introduced water is in the form of liquid or vapor.

**16**. The method for generating chlorine dioxide of claim **11**, further comprising:

providing a measuring cup within said first non-water permeable housing for measuring a preselected amount of water to be introduced to the chemical pouch.

**17**. The method for generating chlorine dioxide of claim **11**, wherein at least one of said chemical pack outer walls and said chemical pouch outer walls are formed from dissolvable filter paper.

**18**. The method for generating chlorine dioxide of claim **11**, wherein said chemical pouch includes at least one interior wall for separating said sodium chlorite from said acid prior to introduction of said water, and said at least one interior wall dissolves when said water is introduced to allow contact between said acid and said sodium chlorite.

* * * * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

ODORSTAR TECHNOLOGY, LLC, et al.,

      Plaintiffs,

                                 Civil Action No.: 0:13-cv-60136-DMM

v.

SMM DISTRIBUTORS, LLC d/b/a
BIOCIDE SYSTEMS, et al.

      Defendants.

_____/

## DEFENDANT SMM DISTRIBUTORS, LLC D/B/A BIOCIDE SYSTEMS' OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (1-7)

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant SMM Distributors LLC d/b/a Biocide Systems (hereinafter "Biocide"), by and through undersigned counsel, hereby provides its Objections and Responses to Plaintiff Odorstar Technology's (hereinafter "Odorstar") First Set of Interrogatories.

## PRELIMINARY STATEMENT

In responding to the Interrogatories propounded by Odorstar, Biocide does not concede the relevance or materiality of any Interrogatory or of the subject to which any Interrogatory refers. Biocide's response to each Interrogatory is made subject to and without waiver of any objections as to privilege, or as to the competency, relevancy, materiality, or admissibility as evidence for any other purpose, of any of the information provided or referred to, or of any of the responses given herein, or of the subject matter thereof, in any proceedings. These responses

shall not be deemed to be a waiver of any rights Biocide has asserted or may assert with respect to any claims by or against it or any defense to such claims.

Biocide's responses to these Interrogatories are based on the facts and information presently known and available to it, and are given without prejudice to Biocide's right to provide or introduce at trial evidence of any subsequently discovered information. Biocide has not completed its investigation of the facts relating to this case, has not completed discovery in this action, and has not completed preparation for any trial that might be held. As a consequence, all responses provided herein are subject to amendment and/or supplementation by Biocide as discovery and Biocide's investigation continues. Biocide reserves the right to further supplement, amend, modify, or alter its responses to the Interrogatories.

## GENERAL OBJECTIONS AND RESERVATION OF RIGHTS

Biocide asserts the following general objections to Odorstar's Interrogatories. These general objections are incorporated into each of the specific individual responses set forth below as if fully set forth therein. Certain of these general objections may be specifically interposed for the purpose of clarity in response to a particular Interrogatory. However, the failure to expressly state any general objection in a particular response should not be misconstrued as a waiver of such objection.

1. Biocide objects to each Interrogatory to the extent that it seeks information protected from discovery by the attorney-client privilege, the common interest privilege, the joint defense privilege, the work-product doctrine, and/or any other exemptions from discovery. If Biocide does not expressly object to a particular Interrogatory on the basis that it seeks information that is privileged or otherwise exempt from discovery, such an omission should not be misconstrued as a waiver of such privilege or objections.

2

SGR11238006.1
SGR/11238006.1

2. Biocide objects to each Definition, Instruction, and Interrogatory to the extent that it seeks information in a manner inconsistent with the Federal Rules of Civil Procedure, the Local Rules of the Southern District of Florida, any other applicable rules of this Court, any Order of this Court, and/or any agreements reached by the parties, or seeks to impose upon Biocide discovery obligations that exceed the scope of such Rules, Orders, and agreements. Biocide will comply with the Federal Rules of Civil Procedure, the Rules and Orders of this Court, and any discovery agreements reached by the parties in responding to Odorstar's Interrogatories.

3. Biocide objects to each Definition, Instruction, and Interrogatory to the extent that it purports to impose discovery obligations on Biocide that exceed the requirements of Federal Rule of Civil Procedure 33. To the extent that Odorstar purports to require Biocide to provide information beyond that required by Federal Rule of Civil Procedure 33, Biocide is thereby being subjected to undue burden and expense. Biocide will comply with the requirements of Federal Rule of Civil Procedure 33 in responding to the Interrogatories.

4. Biocide objects to each Interrogatory to the extent that it prematurely seeks the discovery of information in a manner inconsistent with the schedule set forth in the Federal Rules of Civil Procedure and/or any Order of this Court. For example, Biocide objects to the Interrogatories as premature to the extent that they seek the full disclosure of witnesses, evidence, and theories to be presented by Biocide at any trial of this action before Biocide has had an opportunity to obtain discovery; similarly, Biocide objects to certain Interrogatories as premature to the extent that they seek Biocide's complete contentions in support of its defenses before Biocide has had an opportunity to obtain discovery on certain issues, and to the extent that they prematurely seek disclosure of expert testimony or opinion.

SGR11238006.1
SGR/11238006.1

5. Biocide objects to each Interrogatory that is not limited to a particular time frame to the extent that any such temporally open-ended Interrogatories seek information that is not relevant to any issue in this case.

6. Biocide objects to each Interrogatory to the extent that it would improperly require Biocide or its witnesses, or both, to perform or create studies, analyses, calculations, or compilations that do not currently exist.

7. Biocide objects to each Interrogatory to the extent that it calls for information that is more readily and efficiently obtained through deposition testimony rather than written discovery.

8. Biocide objects to each Interrogatory to the extent that it seeks information that is not in the possession, custody, or control of Biocide and/or to the extent that it seeks information from any person or entity other than Biocide.

9. Biocide objects to each Interrogatory to the extent that it calls for information that is not known by or reasonably available to Biocide.

10. Biocide objects to each Interrogatory to the extent that it seeks information in Odorstar's possession, custody, or control, available to Odorstar from public sources, or obtainable from some other source that is more convenient, less burdensome, or less expensive.

11. Biocide objects to each Interrogatory to the extent that it calls for confidential information which Biocide deems to embody material and/or data that is private, business confidential, proprietary, a trade secret, or otherwise protected from disclosure pursuant to Federal Rule of Civil Procedure 26(c)(1)(G), Federal Rule of Evidence 501, and any other applicable law (referenced herein as "Confidential Information"). Biocide will only produce or provide confidential information subject to the terms of the Protective Order (DE# 37) that has been entered in this case.

4

12. Biocide objects to each Interrogatory to the extent that it purports to require Biocide to disclose information received from a third party under a confidentiality, non-disclosure, common interest, or joint defense agreement. Biocide will not provide information in its possession, custody, or control that it has received from a third party where such information may be deemed confidential or proprietary to such third party unless the third party in question provides its express consent or unless Biocide is compelled to provide such third party confidential information pursuant to court order.

13. Biocide objects to each Interrogatory to the extent that it assumes facts or legal conclusions not yet adjudicated. By responding to these Interrogatories, Biocide does not admit or agree with any explicit or implicit assumption made in the Interrogatories.

14. Biocide objects to each Interrogatory to the extent that it is vague and/or ambiguous.

15. Biocide objects to each Interrogatory to the extent that it is overbroad, seeks information that is not relevant to any issue in this case, and/or seeks information that is not reasonably calculated to lead to the discovery of admissible evidence.

18. As used herein, the term "irrelevant" means that the Interrogatory calls for information that is not relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

19. As used herein, the term "unduly burdensome" means that it would be oppressive, time-consuming, and expensive to compile and furnish the information called for in the Interrogatory.

20. As used herein, the term "overbroad" means that the Interrogatory is unreasonably general, vague, or nonspecific or seeks information beyond the scope of this action.

SGR11238006.1
SGR/11238006.1

21. Biocide objects to the Interrogatories to the extent that they request information that improperly requires the application of legal principles. Biocide also objects to the Interrogatories to the extent that they call for a legal conclusion.

**INTERROGATORY NO. 1.**

State in detail the basis for your allegations in your Sixth Defense in your Answer that "Biocide possessed an express and/or implied license for practicing the alleged invention of the '661 Patent."

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 1**

Subject to the General Objections, Biocide responds as follows:

In 2007 Mr. Juan Carlos Baselli met Mr. Greg Boyle at his niece's bat mitzvah. Mr. Baselli and Mr. Boyle began to converse about their respective fields of employment. Mr. Baselli explained that he and Mr. Spencer Blua were working on a business venture placing privately owned ATMs in hotels in Mexico. As a result of this business venture, Mr. Baselli explained, he and Mr. Blua had multiple influential contacts in Mexico. Mr. Boyle began telling Mr. Baselli about Mr. Boyle's company, Odor Science, and his involvement with chlorine dioxide and a product called NosGuard as well as U.S. Patent No. 6,764,661 ("the '661 Patent"). Mr. Boyle then expressed an interest in talking to Mr. Baselli further about distributing Odor Science's products in Mexico.

About a week after their initial meeting, Mr. Boyle sent samples of the NosGuard product and a flyer advertising the same to Mr. Baselli along with Mr. Blua. After receiving samples of the NosGuard product, Mr. Baselli and Mr. Blua became interested in chlorine dioxide's potential as a biocide and odor eliminator. On behalf of Biocide, Mr. Baselli and Mr. Blua began negotiating with Mr. Boyle via email and telephone. Mr. Boyle represented that he, through a

6

SGR\11238006.1
SGR/11238006.1

company called BBL Distributors, possessed the exclusive master distribution rights from the owner of the '661 patent, Avantec Technologies.

Biocide continued to negotiate with Mr. Boyle regarding exclusive distribution rights for Latin America and Western U.S. territories. After several months of negotiations, an understanding was reached and the distributor agreement was signed. A copy of the distributor agreement was attached to the Amended Complaint as Exhibit G1.

## INTERROGATORY NO. 2.

For each of the asserted claims in the Patent-in-Suit, please explain how SMM Distributors, LLC contends the claim should be construed, including the following information:

a. for each preamble, state whether you contend it is a substantive limitation;

b. identify any terms that you contend should be construed according to 35 U.S.C. § 112, 6th paragraph;

c. for each limitation that you construed according to 35 U.S.C. § 112, 6th paragraph identify every structure in the specification that you contend corresponds to the claimed function (i.e., identify every structure that you contend satisfies the limitation);

d. identify any words or terms that you contend should be construed to have anything other than their ordinary meaning to a person of ordinary skill in the art and, for each such term, state that special meaning and identify the portion of the specification that provides it;

e. identify any words or terms that you contend should be construed to have anything other than their ordinary meaning to a layman, and for each such term, explain how those skilled in the art use the term differently from layman; and

f. as to any words or terms that you contend have ordinary meaning, please provide your definition of the ordinary meaning of such words or terms.

## OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 2

Biocide objects to this Interrogatory on the grounds that it contains subparts. Biocide also objects to this Interrogatory on the grounds that Odorstar has not disclosed which claims of the Patent-in-Suit are actually being asserted. The Amended Complaint states only that "one or more claims" of the '661 patent are infringed. Amended Complaint ¶ 35. However, in the spirit of discovery, Biocide will respond to the subparts of Interrogatory 2 with specific reference to Claim 1, and reserve the right to supplement these responses if further discovery reveals that

7

more than Claim 1 is being asserted.   In any event, where terms are common to Claim 1 and other claims, the following positions will be asserted with respect to the same or similar terms and phrases used in other claims.

Subpart a.  Biocide takes the position that the preamble of Claim 1 is limiting.

Subpart b.  Biocide takes the position that the limitation "wick means" in claim 1 should be construed according to 35 USC § 112, 6th paragraph.  Although Biocide is not aware of any specific claims other than Claim 1 that is being asserted, any other asserted claims that use "wick means" would also be construed under 35 USC § 112, 6th paragraph.

Subpart c.  Biocide takes the position that the "wick means" corresponds to the "wick member" 24 which is connected to the membrane shell 22, and extends at least partially out of the compartment 30 formed between the two panels 22A and 22B that form the membrane shell 22.  The wick member 24 is always a flat panel or sheet, preferably rectangular in shape to ease and simplify construction and reduce cost.  In some embodiments, the wick member could comprise two wick members, and in other embodiments the wick members may extend outwardly of the compartment from all four sides of the device.

Subpart d.  Biocide takes the position that all words or terms can be given their ordinary meaning, so long as the word "wick" or words "wick member" means to absorb liquid and transport the liquid from one location, in this case a location outside the membrane shell, to a second location, in this case a location inside the membrane shell.  To the extent that Odorstar proffers any definition that does not coincide with the foregoing, Biocide offers the foregoing as its "construction" of the word "wick" or words

"wick member."  Biocide's position would apply to any claim where these words are used, but specifically, to the words as they appear in Claim 1.  The specification supports that the ordinary meaning of these words comports with the foregoing definition, at the following locations, at least: Col. 6, lines 60-67 and Col. 7 lines 1-2 where it is stated that the wick member 24 fits into the compartment 30, extending preferably 15% beyond the open end of the compartment, and while not specifically stated, this is the classic look of a candle having a wick, where the wick extends into the solid mass of the candle, absorbs liquid wax as it melts, and transports it to the upper end of the wick for burning.  In the present case, the "wick" absorbs water from outside the membrane shell  22 and transports it into the compartment 30.  In a second embodiment (Figs. 4-6), the wick 24 nonetheless absorbs liquid and transports it into the compartment.  Col. 13, lines 13-14.  Later, at Col. 17 lines 34-40, it is stated that the wick 24 carries out many functions: it absorbs water and transports it into the compartment and thus decreases the time it takes for water to get into the device, and the wick also acts as a physical barrier to keep chemicals apart (dividing the compartment into sub-compartments).

Subpart e.  Biocide takes the same position with respect to Subpart e. as they do for Subpart d., except that they take the position that laypersons are not the intended audience of the specification, and explanations of how the claimed invention works can be made by counsel at trial, with help as deemed necessary by the trial judge with whom the duty of claim construction resides.

Subpart f.  Biocide objects to this subpart as being premature and burdensome, in the sense that Odorstar has not made its case of infringement known, and in particular, has not identified which claims it believes are infringed, other than to say "one or more

9

claims" of the patent.  In any event, Biocide has provided a definition for "wick" and/or

"wick means" in response to Subpart d. above, and that response is incorporated herein

by reference.  To the extent that "membrane shell" has an ordinary meaning, it means a

structure that has two halves which together define an interior compartment, much like a

clam shell has two symmetric halves.  In the present case, because of the use of the word

"membrane" the shell halves must be permeable to gas but not liquid.  As stated in the

specification, the membrane is "substantially impervious" to liquid and preferably

"completely impervious," so that gas exits the membrane through the walls, and liquid

exits through the wick.  See Col. 7 lines 45-55.  Any use of the word "shell" in the claims

without the modifier "membrane" could be referring to a liquid permeable embodiment,

but if "membrane" is used together with "shell," as in "membrane shell," Biocide takes

the position that the ordinary meaning of the terms would require that the shell be gas

permeable only.

## INTERROGATORY NO. 3.

Set forth in full the facts and circumstances on which SMM Distributors LLC bases its
allegations in paragraph 34 of its Answer that SMM Distributors LLC has not "infringed, either
directly, contributorily, or by inducement, any claim of the '661 Patent, either literally or under
the doctrine of equivalents.

### OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 3

Biocide objects to this Interrogatory to the extent it purports to require Biocide to state its

non-infringement case prior to the deadline for expert reports.  Biocide's entire non-infringement

position will be laid out in its expert report, which will be duly issued by the date ordered by the

Court.  Biocide further object to Interrogatory No. 3 since the complaint is vague as to which

claims, other than arguably claim 1, Odorstar believes are infringed by Biocide.  However, with

reference to Claim 1, and given that Odorstar has averred that "one or more claims" are

SGR11238006.1
SGR/11238006.1

infringed, Biocide takes the position that its devices have no wick or wick means and it does not

have a "membrane shell" in any of its products.  See below.

| THE '661 PATENT | BIOCIDE SYSTEMS PRODUCTS |
|---|---|
| A device for producing an aqueous chlorine dioxide solution when exposed to water comprising: | Biocide Systems takes the position that the preamble is limiting. |
| a membrane shell defining a compartment which includes one or more dry chemical components capable of producing chlorine dioxide gas when exposed to water; and | Biocide Systems does not have a membrane shell.<br>During prosecution, the examiner allowed the claims over the prior art because the prior art "membrane shell" allowed water to pass through the membrane shell and into contact with the dry active ingredients. Proper claim construction will require "membrane shell" to mean "a membrane that is impervious to water but permeable to gas." Biocide Systems' product includes an outer, water permeable package or pouch which allows water to enter the outer package. |
| wick means connected to said membrane shell and extending into said compartment for absorbing water and transporting water into said compartment | Biocide Systems does not have a wick means.<br>No wick is used to "transport" water into the interior of the outer package. Water flows freely through the outer package and into contact with an inner package that contains dry constituent materials. The inner package is made of paper that dissolves on contact with water. Cellulose pellets are contained within the outer package and are randomly oriented, loose and movable. The outer package is placed in a cup to which is added a predetermined amount of water. The water flows freely into the outer package and into contact with the inner package and the cellulose pellets. After the water dissolves the inner package, the water and constituent materials combine to form an aqueous solution of chlorine dioxide and water. This solution is absorbed by cellulose pellets that were contained in the outer package. The pellets are not wicks because according to the patent and the file history comments, the wick has to be used to transport water from outside the membrane shell to inside the membrane shell. |

11

| | |
|---|---|
| | Moreover a wick, as used in the patent, specifically transports water in a particular direction. The cellulose pellets do not transport water in a particular direction. |
| Whereby when said device is exposed to water said wick means transports water into said compartment, said Chemical component(s) dissolve in the water and produce chlorine dioxide gas in said compartment, | The pellets do not transport water into the device. The pellets absorb some of the water which entered freely into the first package. After water dissolves the inner package, water and active ingredients combine to form a solution of chlorine dioxide. There is no production of gas in a compartment, and there is no "compartment" within the outer package, given that the outer package is so thin and subject to fluid flow, both gas and liquid. The inner package cannot be a "membrane shell" either since it dissolves after contact with water, and it does not cooperate with a "wick" to bring water into its interior. |
| and chlorine dioxide gas exits said compartment through said membrane shell. | The outer package is not a membrane and does not define or otherwise form a compartment, so that there cannot be "gas exit[ing] said compartment through said membrane shell." |

## INTERROGATORY NO. 4.

State whether SMM Distributors LLC has ever requested or received an opinion, report, or analysis, written or oral, relating to the validity, enforceability or infringement of the Asserted Patent, and, if so, for each such opinion, report or analysis, identify the date SMM Distributors LLC received such opinion, report or analysis, whether it was oral or in writing, the subject matter, authors and recipients, and substance of the opinion, report, or analysis, and the identity of all persons who relied on such opinion, report or analysis.

### OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 4

Biocide objects to this Interrogatory to the extent that it purports to require Biocide to disclose information protected by the attorney-client privilege. Subject to this and the General Objections, Biocide responds as follows:

SGR11238006.1
SGR/11238006.1

Biocide has contracted with its expert in the instant case, Mr. Howard Alliger, to perform a non-infringement analysis of Biocide's products with respect to the '661 patent. Mr. Alliger's report has not been completed at the time of these Responses.

Additionally, Biocide contracted with Mr. James Chia, a chemist and former Avantec Technologies employee, to determine if Biocide's products infringed the '661 patent. The consulting agreement between Biocide and Mr. Chia is being produced concurrently herewith and can be found at SMM_000248 – SMM_000249. Mr. Chia has not provided a report to Biocide.

## INTERROGATORY NO. 5.

Identify each instance where SMM Distributors LLC or any person on behalf of SMM Distributors LLC viewed, examined, inspected, analyzed, tested, disassembled, reverse engineered, and/or copied any feature, component, design and/or operational characteristic of any NOSGUARD® brand product sold by Star-Brite Distributing, Inc., and for each such instance identify the person(s) involved, when it occurred, where it occurred, and all documents that relate or refer thereto.

### OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 5

Subject to the General Objections, Biocide responds as follows:

Mr. Blua and Mr. Baselli have both handled NosGuard products, however, Biocide did not and has not ever examined, inspected, analyzed, tested, reverse-engineered or disassembled any NOSGUARD product.

## INTERROGATORY NO. 6.

Identify each customer of SMM Distributors LLC and, for each such customer, identify the number of Accused Products purchased or leased, the date(s) of the purchase(s) or lease(s), and the dollar amount of each such purchase or lease.

### OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 6

13

Subject to the General Objections, Biocide responds as follows:

Biocide does not keep customer lists.   Biocide's customers can be determined by reviewing its invoices, bills, and financial records, which are being produced concurrently herewith pursuant to the Protective Order.   Pursuant to Rule 33(d), Biocide has produced documents sufficient to enable Odorstar to determine the information requested, and for which the burden of deriving or ascertaining the answer is substantially the same for either party.

**INTERROGATORY NO. 7.**

Please provide the name, address, telephone number, place of employment and job title of any person who has, claims to have or whom you believe may have knowledge or information pertaining to any fact alleged in the pleadings (as defined in Federal Rule of Civil Procedure 7(a)) filed in this action, or any fact underlying the subject matter of this action.

**OBJECTIONS AND RESPONSE TO INTERROGATORY NO. 7**

Subject to the General Objections, Biocide responds as follows:

1. Spencer Blua. Mr. Blua may be contacted through Defendants' counsel.
2. Juan Carlos Baselli.  Mr. Baselli may be contacted through Defendants' counsel.
3. James Liang-Hiong Chia, 1298 Langston Dr., Columbus, OH, 43220, (614) 886-8088.
4. Jack Skeels, Topanga Canyon, CA, (310) 346-9899.
5. Walter Herrera, 11850 Old River School Rd. #1, Downey, CA, 90241, (562) 286-3535.
6. Lenny House, (908) 809-9675.
7. Todd Schroeter, 3247 Pearl Rd., Medina, OH 44256, (607) 267-6329.
8. Greg Boyle, 64 Spring Valley Rd., Oradell, NJ 07649, (201) 421-1092.
9. Steven Wise, 200 Mildred Dobbs Blvd. N., Lethbridge, AB T1H 5M7, Canada, (403) 795-3327.

SGR11238006.1
SGR/11238006.1

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  July 22, 2013                    By:

Spencer Blua
Chief Financial Officer
SMM Distributors LLC d/b/a Biocide
Systems

As to objections,


**SMITH, GAMBRELL & RUSSELL, LLP**
Bank of America Tower
50 N. Laura Street, Suite 2600
Jacksonville, FL  32202
Tel.: (904) 598-6100
Fax: (904) 598-6300

James W. Middleton
Florida Bar Number 508152
jmiddleton@sgrlaw.com

and

Edward A. Pennington, Esq. (*pro hac vice*)
epennington@sgrlaw.com
Sean T.C. Phelan (*pro hac vice*)
sphelan@sgrlaw.com
**Smith, Gambrell & Russell, LLP**
1055 Thomas Jefferson Street, N.W.
Suite 400
Washington, D.C. 20007
Tel.: (202) 263-4300
Fax: (202) 263-4348
*Attorneys for Defendants*

SGR/11232209.1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 22, 2013, a true and correct copy of the foregoing

DEFENDANT SMM DISTRIBUTORS, LLC D/B/A BIOCIDE SYSTEMS' OBJECTIONS

AND RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES (1-7) was served

via email and Overnight Mail on the following:

> Garrett Ari Barten
> Christopher & Weisberg
> 200 E Las Olas Boulevard
> Suite 2040
> Fort Lauderdale, FL 33301
> Email: gbarten@cwiplaw.com

> s/ Sean T.C. Phelan
> Sean T.C. Phelan

16

SGR11238006.1
SGR/11238006.1

# CLO2-DMG Technology™
### Patent Pending

Chlorine dioxide disposable micro generator (pouch) for use as a deodorizer to eliminate odors caused by bacteria, mold, mildew and chemical odors in confined spaces.

| | |
|---|---|
| ACTIVE INGREDIENTS: Sodium Chlorite | 30% |
| OTHER INGREDIENTS: | 70% |
| TOTAL: | 100% |

# CAUTION
## KEEP OUT OF REACH OF CHILDREN
### Manufactured by CLOO Labs Inc.™. Los Angeles, CA
### Exclusively Distributed by SMM Distributors LLC, Dba Biocide Systems

## Storage and Disposal

Do not contaminate water, food or feed by storage or disposal.

STORAGE: Store this product in the original unopened packaging until ready for use. Store in a cool, dry well ventilated area away from heat or open flame. Store in an area that is inaccessible to children.

EMERGENCY HANDLING: In case of spill, contamination or decomposition, do not reseal package. If possible isolate package and discard it in an open well ventilated area.

DISPOSAL: Do not reuse empty packaging pouch. Discard empty packaging pouch and spent CLO2-DMG Technology™ pouch in an outdoor refuse container.



**WARNING:** DO NOT leave in direct sunlight, enclosed vehicles, or store in, or expose to, temperatures above 120°F (49°C).

# Precautionary Statement

AUTION. May cause moderate eye and throat irritation. Harmful if inhaled, swallowed or sorbed through skin. Avoid contact with eyes or clothing. If pouch breaks, remove any leakage om skin or clothing. Avoid breathing dust and do not get in eyes, on skin or clothing. Wash hands oroughly after handling.

## nvironmental Hazards

lis product is toxic to fish and aquatic invertebrates. Do not contaminate water with this product.

## hemical/Physical Hazards

lis product contains an oxidizing agent. Do not mix with acids or chlorine. Avoid any contact with ame or burning materials.

## FIRST AID

| | |
|---|---|
| If in eyes | • Hold eye open and rinse gently for 15 - 20 minutes.<br>• Remove contacts if present after the first 5 minutes then continue rinsing the eye.<br>• Call a poison control center or doctor for treatment advice. |
| If swallowed | • Call a poison control center or doctor for treatment advice.<br>• Have a person sip a glass of water if able to swallow.<br>• Do not induce vomiting unless told to do so by the doctor of poison control center.<br>• Do not give anything by mouth to an unconscious person. |
| If on skin or clothing | • Take off contaminated clothing.<br>• Rinse skin immediately with plenty of water for 15 - 20 minutes.<br>• Call a poison control center or doctor for treatment advice. |
| If inhaled | • Move person to fresh air.<br>• If person is not breathing call 911 or an ambulance, then give artificial respiration, preferably mouth to mouth if possible.<br>• Call a poison control center or doctor for treatment advice. |

Have the product container with you when calling a poison control center or doctor or going for treatment.

**QUESTIONS? (877) 792-4624  |  www.CLOOLABS.com**

MIS-RT-01-051712

inside and discard desiccant. Save foil packet until treatment is finished.

4. Take the CLO2DMG Technology™ white pouch and shake thoroughly to mix ingredients. Then place pouch back in the container provided.

5. Place container in designated area, for additional safety place on a plate or container lid to prevent damage from spillage, staining or bleaching.

6. Using measuring cup provided add one full measuring cup of warm tap water over pouch to activate. **DO NOT PUT LID BACK ON CONTAINER** until treatment is over and product is ready to be discarded.

7. **Lock cabin** to prevent others from entering cabin while product is working. **WARNING: Under no circumstance should any person or pet be in the vehicle while the marineSHOCKER™ is working.**

8. Leave the marineSHOCKER™ working for 4 to 24 hours.

9. At end of treatment open all doors for ventilation, and place lid back on the marineSHOCKER™ and dispose in an outdoors waste container.

10. Allow cabin to ventilate for 20 minutes before entering.

**TIPS:** In order to ensure optimal performance, you may want to follow these tips.

a. Before using marineSHOCKER™, make sure all interior compartments are open (ie. Glove box, armrest compartments, etc.).

b. Pull down all visors.

c. Place floor mats on their sides.

d. Clean out ashtrays and remove trash.

e. Change air filters.

f. Before step 9, set fan to recycle and run fan for 15 minutes.





